```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2
     ------------------------------------x
 3   CHAUNCEY GIRARD,

 4                             Plaintiff,

 5                                  Case No. 20-cv-5883-CS
         -vs-
 6
     ERIC GUTWEIN, et al.,
 7
                             Defendants.
 8
     ------------------------------------x
 9
                                  United States Courthouse
10                                White Plains, New York

11                                January 26, 2022
                                  10:45 a.m.
12
                        ** VIA TELECONFERENCE **
13

14   B e f o r e:
                             HONORABLE CATHY SEIBEL
15
                             United States District Judge
16

17   A P P E A R A N C E S:

18   CHAUNCEY GIRARD, Pro Se Plaintiff

19
     NEW YORK ATTORNEY GENERAL'S OFFICE
20       Attorneys for Defendants
         44 South Broadway, Fifth Floor
21       White Plains, New York 10601
     BY:  RACHEL C. ZAFFRANN
22

23

24

25
```

1          THE DEPUTY CLERK:  Good morning, Judge.  This matter

2  is Girard v. Gutwein, case number 20-cv-5883.  Plaintiff,

3  Mr. Chauncey Girard, is on the line, as well as Ms. Rachel

4  Zaffrann for defendants.  Our court reporter Darby is on, and

5  Jenny is on.

6          THE COURT:  All right.  Good morning, everybody.  I

7  have defendants' motion to dismiss.  I am prepared to rule.  Is

8  there anything either side wants to add that's not covered by

9  the papers?

10          MR. GIRARD:  Yes.  I would like to add in light of the

11  motion to dismiss that the documents that I sent to the Court

12  that the motion to dismiss would be not accurate because the

13  attorney general would undermine the authority of the Court by

14  stating that I didn't exhaust my state remedies, and I

15  specifically showed that all my state remedies was exhausted.

16          Furthermore, I feel as if my motion to dismiss their

17  motion should be granted due to that fact because I have shown

18  the documents with the documents --

19          THE COURT:  Okay.  Well, yeah, if there is anything

20  you want to say that isn't covered by the papers, now is the

21  time, but I have read all of your papers --

22          MR. GIRARD:  Right.

23          THE COURT:  -- and looked at the documents.  So if

24  there is anything additional, go right ahead, but you don't have

25  to remind me of what's in your papers.

1          MR. GIRARD:  Right.  I just wanted to put in for

2    summary judgment because right now -- I'm going through a lot

3    right now.  I'm trying to get medical attention, and I'm getting

4    charged for the medical attention that I am receiving while I am

5    in the prison.  I got a notice from these attorneys and doctors.

6    They have been charging me money for just getting medical

7    attention.  I am going blind in my eyes.  I can't -- I am

8    legally blind.  I can't see, and I like -- I would like to have

9    like some type of legal assistance towards this case.  If not, I

10   would like to have some type of summary judgment action.

11         THE COURT:  So let me explain a couple of things.

12   First of all, right now this is a motion to dismiss.  I will

13   tell you now that some of the claims are going to survive the

14   motion to dismiss, and then I am going to give you a whole

15   ruling.

16         Then before either side moves for summary judgment,

17   ordinarily, in almost every case you have to have discovery

18   first.  You can't go right from complaint to summary judgment

19   because both sides need to gather the evidence that they are

20   going to use on summary judgment.

21         MR. GIRARD:  Is that --

22         THE COURT:  You know, right now, if you moved for

23   summary judgment now, you would say, all of these bad things

24   happened to me, and the defendants would say, no, they didn't.

25   And I would have to deny the motion because the -- there would

1    be a fact dispute.  So that's why the parties take discovery;

2    ask each other questions; collect documents to try to gather

3    evidence to support their side of the story.  That's number one.

4              Number two, I'm sorry for your troubles, but they are

5    not part of this case.  This case is about what happened in

6    Green Haven.  You are up in Fairhill now.

7              MR. GIRARD:  No.  I am in Franklin.

8              THE COURT:  Oh, you are at Frankin now.  Sorry.

9    That's not even in the Southern District.  So the stuff that --

10   you know, if you have any claims relating to what's happening to

11   you there, they can't be part of this lawsuit.  They would have

12   to be part of a different case.  That's number two.

13             MR. GIRARD:  This is stemming from --

14             THE COURT:  I am sorry.  Go ahead.

15             MR. GIRARD:  Sorry to cut you off.  This is stemming

16   from this case, though.  That's what I am trying to say, this

17   has happened before whatever happened.

18             THE COURT:  Well, what makes you think that what's

19   happening now stems from this case?

20             MR. GIRARD:  Because the injuries are still the same.

21             THE COURT:  Yes, but the medical -- if you are not

22   getting the proper medical care, that's being done by somebody

23   in Upstate New York.  It's not occurring in the Southern

24   District.  So to the extent you have claims against the people

25   at the facility that you are at now, they have to be brought

1   there.

2          MR. GIRARD:  Right.

3          THE COURT:  They are just -- they are related in the

4   sense that the need -- maybe the need for medical treatment

5   arose from what happened here, but it's different defendants,

6   different claim, different district, different personnel.  It's

7   not part of this case.

8          The third thing is there is no right to counsel, as

9   you know, in civil cases, and the most I could do would be to

10  see if there is a volunteer lawyer who is willing to volunteer,

11  but there are many, many, many more unrepresented people,

12  prisoners and non-prisoners alike, who want volunteers than

13  there are lawyers who are willing to volunteer, and the ones who

14  are willing to volunteer almost invariably wait until a much

15  later stage of the case to see if there is going to be a trial

16  or not.

17         In determining whether I should even ask for counsel,

18  one of the issues is -- the first issue I have to determine is

19  whether the claims are going to be of substance, and then there

20  are other factors.  So at this stage, you know, I am not

21  prepared to even begin the process of looking for counsel.  I

22  think it would be futile anyway at this stage, but I am going to

23  give my ruling on the motion to dismiss, and then we will talk

24  about discovery.

25         MR. GIRARD:  Okay.

```
 1              THE COURT:  All right.  So for purposes of the
 2    motion -- and make yourselves comfortable.  This is going to
 3    take a while because there are many claims and many defendants;
 4    and, Mr. Girard, you might -- well, both of you might want to
 5    take notes.
 6              MR. GIRARD:  Can I just get a pen real quick?
 7              THE COURT:  Sure.
 8              MR. GIRARD:  Thank you.
 9              THE COURT:  So for purposes of the motion, I accept as
10    true the facts, but not the conclusions, in the Amended
11    Complaint, which I'm going to call the AC, which is ECF number
12    39; the original complaint, which is ECF number 2, and
13    plaintiff's opposition to the motion, which is ECF number 60.  I
14    can give the plaintiff the benefit of considering that in all of
15    those documents.  See *Washington versus Westchester County*, 2015
16    Westlaw 408941 at page 1, note 1, Southern District, January 30,
17    2015; and *Braxton versus Nichols*, 2010 Westlaw 1010001 at
18    page 1, Southern District, March 18, 2010.
19              The facts are as follows -- and by the way, my
20    chambers will send Mr. Girard copies of any unreported cases
21    that I cited to.
22              MR. GIRARD:  Okay.
23              THE COURT:  Plaintiff is an inmate with DOCCS.  His
24    complaint is not easy to understand, but as best as I can tell,
25    the facts are as follows:  On July 31st of 2018, plaintiff had
```

1   trouble breathing and requested emergency sick call.  He

2   contacted defendant Correction Officer Tomas, who called

3   defendant Sergeant Elmore and C.O. Polito.  Defendants Elmore

4   and Polito handcuffed the plaintiff to transport him to medical.

5   Defendant Polito pushed plaintiff to the wall, perhaps to

6   pat-frisk him, and then placed his hands, "inside of plaintiff's

7   pants," grabbed plaintiff's genitals with his bare hands,

8   stroked him for several minutes, and said, "Nice."  I am getting

9   this from the amended complaint at page 9, the original

10  complaint at page 6, and plaintiff's opposition at page 5, and

11  the amended complaint at page 5.  Putting all that together

12  because not all of those allegations were in all of those

13  documents, defendant Elmore is alleged in the AC at 9 to have

14  watched the sexual assault and not done anything about it.

15          While walking to medical, defendant Polito punched

16  plaintiff in the face and stomach, and defendant Correction

17  Officer Rios joined in punching the plaintiff twice.  That's the

18  AC at pages 9 to 10.  They also allegedly sprayed plaintiff, and

19  at some point defendant Sergeant Blot joined in by punching

20  plaintiff in the eye.  Plaintiff's injuries included a

21  concussion, lacerations, hemoptysis, contusions and blood in the

22  urine.  That's at pages 10 to 11 of the AC.  Defendant Elmore is

23  alleged to have watched the alleged beating and done nothing to

24  stop it and failed to provide a medical response.  That's at

25  pages 9 to 10.  Plaintiff alleges that he was assaulted in

1 retaliation for having filed a Section 1983 lawsuit.

2          During or shortly after the assault, plaintiff became

3 unconscious and woke up in the shower in the SHU.  Fake charges

4 were allegedly filed against him to cover up the assault, and at

5 a subsequent hearing, Commissioner Hearing Officer Gutwein, who

6 is a defendant, allegedly violated plaintiff's rights in that

7 plaintiff was only permitted to call some of his witnesses, or

8 if you look at the amended complaint at 15 -- I am sorry --

9 plaintiff was only permitted to call four witnesses.  If you

10 look at the amended complaint at 15, he says he wanted to call

11 ten.  If you look at page 11, he says he wanted to call 11.  In

12 any event, he says -- and this is from pages 10 through 11 at

13 15 -- that Gutwein only let him call a fraction of his

14 witnesses; that plaintiff asked for, but did not receive audio

15 and video of cameras 33, 192 or 191; that plaintiff only got

16 pictures after the hearing was over; that Gutwein secretly

17 called witnesses behind plaintiff's back and tried to bribe him.

18          At the disciplinary hearing, plaintiff was given

19 either 120 or 150 days in the SHU.  The page 11 says 120 days.

20 Page 15 says 150.  Plaintiff's opposition says 150.  He lost

21 five months of good time, according to the AC at 11 through 15,

22 and was not given any disposition to appeal.  That's at page 11.

23          At some unspecific point in time, defendant Dr. Uzu

24 cancelled a previously-scheduled MRI.  Plaintiff cites Exhibit F

25 90326-18, but we could not locate that document.

1          At another unspecified point in time, Dr. Uzu ordered

2    a CT scan, but he did not issue plaintiff a permit for his

3    shoulder while he was in the SHU.  At other unspecified points

4    in time, defendant Lamanna saw plaintiff's injuries and received

5    a letter and grievances, but didn't do anything to help

6    plaintiff and failed to do anything to prevent further damage.

7    That's at pages 11 to 14.

8          On July 28, 2020, plaintiff filed his complaint

9    against Commissioner Hearing Officer Gutwein, Superintendent

10   Lamanna, Sergeant Elmore, Sergeant Blot, C.O. Polito, C.O.

11   Tomas, C.O. Rios, and Dr. Uzu.  On March 23rd, defendants filed

12   a pre-motion letter in anticipation of their motion to dismiss.

13   Plaintiff responded on April 13.  We had a conference on

14   April 23rd at which I granted leave to amend.  The amended

15   complaint was filed on May 17th.  On August 5th, plaintiff --

16   defendant filed the instant motion, which is ECF number 51.

17   Plaintiff filed his opposition in September.  Defendants filed

18   their reply in October.  Plaintiff's opposition is ECF number

19   60.  Defendant's reply is ECF number 61.  On November 3rd, after

20   the motion was fully briefed, plaintiff sent a letter attaching

21   document ECF number 62.

22          At the April 23rd pre-motion conference, I explicitly

23   told plaintiff that his amended complaint shouldn't contain

24   legal documents, but -- excuse me -- legal arguments, but it

25   does; and it reads more like a brief or a memorandum of law than

012522.2                         PROCEEDINGS                         10

1  an amended complaint.  I also said plaintiff shouldn't make his

2  submission a hundred pages long.  He didn't listen.  The amended

3  complaint is 207 pages, including legal argument, and more than

4  180 pages of exhibits, many of which are medical records or

5  grievances regarding matters unrelated to this claim, and his

6  opposition includes approximately 115 pages of exhibits and

7  judicial opinions.

8           Plaintiff should understand that if he has relevant,

9  significant information, it is not to his advantage to bury it

10 in a stack of irrelevant material because I cannot read his mind

11 and discern what he wants me to consider within those documents,

12 and nor can I go through large volumes of material to identify

13 allegations or theories that plaintiff has not advanced.

14          The legal standard governing a motion to dismiss for

15 failure to state a claim on which relief could be granted comes

16 from *Ashcroft versus Iqbal,* 556 U.S. 662, and *Bell Atlantic*

17 *versus Twombly,* 550 U.S. 544.

18          To survive a motion to dismiss, a complaint has to

19 have sufficient factual matter, accepted as true, to state a

20 claim to relief that is plausible on its face.  That means it

21 has enough factual content for the Court to draw the reasonable

22 inference that the defendant is liable for the misconduct

23 alleged.  Detailed factual allegations are not necessary, but a

24 plaintiff's obligation to provide the grounds of his entitlement

25 to relief requires more than labels and conclusions or a

1  formulaic recitation of the elements of the claim.  Rule 8 is

2  generous departure from the hypertechnical regime of a prior

3  era, but it does not permit discovery for a plaintiff who

4  alleges nothing more than a conclusion.

5          The Court has to begin by identifying pleadings that,

6  because they are conclusions, are not entitled to the assumption

7  of truth, and then has to decide whether the remaining factual

8  allegations accepted as true plausibly give rise to entitlement

9  to relief.  This is a context-specific task that requires the

10 court to draw on its judicial experience and common sense.

11 Well-pleaded facts do not permit the court to infer more than

12 the mere possibility of misconduct.  The complaint has alleged,

13 but not shown, that the pleader is entitled to relief, and that

14 is not enough under Rule 8.

15         On the motion to dismiss, a court's generally confined

16 to the four corners of the complaint, the documents incorporated

17 in, or attached to, the complaint, documents on which the

18 plaintiff relied in bringing the case and things of which the

19 court can take judicial notice.  See *Kleinman versus Elan*, 706

20 F.3d 145 at 152.  But a court can consider documents outside the

21 complaint as they relate to exhaustion if submitted by

22 defendants under limited circumstances.  See *McGee versus*

23 *McGready*, 2018 Westlaw 2045094 at page 2, Southern District,

24 April 30, 2018.  Those include situations where the complaint

25 was a standard *pro se* form complaint with a check-box regarding

1 exhaustion, or contained allegations clearly stating the inmate

2 has exhausted, or clearly pointed to the fact that the inmate

3 had, in fact, not exhausted.  That's again *McGee* at page 2.

4 I've considered the exhibits attached to the amended complaint

5 to the extent they relate to exhaustion.  That's ECF number 39-1

6 at 39 to 40, and 39-2 at 1 to 5; and to the extent they relate

7 to the disciplinary hearing, the transcript of which is ECF

8 number 39-4.

9        I can also consider exhibits submitted by a *pro se*

10 plaintiff as part of his opposition.  *Smith versus County of*

11 *Westchester*, 2019 Westlaw 3006407 at page 4, note 3, Southern

12 District, July 10, 2019; and *Milano versus Astrue*, 2007 Westlaw

13 2668511 at page 2, Southern District, September 7, 2017.

14        So I consider ECF number 60-1 at pages 2 to 7 relating

15 to exhaustion, but most of the documents plaintiff attaches to

16 his opposition related to plaintiff's injuries, which are not at

17 issue on this motion.

18        Submissions by *pro se* plaintiffs are to be examined

19 with special solicitude, *Tracy versus Freshwater*, 623 F.3d 90 at

20 102, interpreted to raise the strongest arguments they suggest,

21 *Burgos v. Hopkins,* 14 F.3d 787 at 790; held to less stringent

22 standards than formal pleadings drafted by lawyers, *Hughes*

23 *versus Rowe*, 449 U.S. 5 at 9.  Nevertheless, threadbare recitals

24 of the elements of a cause of action, supported by mere

25 conclusory statements, do not suffice, and district courts

1  cannot invent factual allegations that the plaintiff has not

2  pleaded.  *Chavis versus Chappius*, 618 F.3d 161 at 170.

3          I first discuss exhaustion.  The Prison Litigation

4  Reform Act, or PLRA, requires exhaustion of available

5  administrative remedies, including compliance with an agency's

6  deadlines and procedures before inmate-plaintiffs may bring

7  their federal claims about prison conditions to court.  *Woodford*

8  *versus Ngo*, 548 U.S. 81 at 90; see 42 U.S. Code

9  Section 1997e(A).  For inmates in New York prisons, this

10 involves compliance with DOCCS's three-tiered Inmate Grievance

11 Program or IGT, in which:  One, the plaintiff must file a

12 grievance with the Inmate Grievance Resolution Committee or

13 IGRC, within 21 days of the alleged occurrence; two, the

14 prisoner must then appeal an adverse decision by the IGRC to the

15 superintendent of the facility within seven days after receipt

16 of the IGRC's response; and three, the prisoner must then appeal

17 an adverse decision by the superintendent to the Central Office

18 Review Committee, or CORC, within seven days of receipt of the

19 superintendent's response.  See 7 New York Compilation of Codes

20 and Regulations Section 701.5, and *McGee* at page 2.  The IGP

21 requires CORC to respond to an appeal within 30 days of its

22 receipt.  7 N.Y.C.C.R. Section 701.5(d)(3)(ii).  Once that

23 30-day deadline has elapsed, inmate-plaintiffs are deemed to

24 have exhausted and are free to file suit even if CORC has not

25 rendered a decision.  *Hayes v. Dahlke*, 976 F.3d 259 at 270 to

012522.2                        PROCEEDINGS                        14

71.  The PLRA exhaustion requirement applies to medical
treatment claims.  See *King versus Puershner*, 2019 Westlaw
4519692 at pages 8 to 9, Southern District, September 19, 2019;
and *Long versus Lafko*, 254 F.Supp.2d 444 at 446 to 48, Southern
District, 2003; but not to sexual abuse or harassment claims;
see *Sheffer versus Fleury*, 2019 Westlaw 4463672, Southern
District, September 18, 2019; see also 7 N.Y.C.C.R.
Section 701.3(i), which cites the Prison Rape Elimination Act,
or PREA standards, 28 C.F.R. Section 115.52(a).

        Complaints regarding sexual abuse or harassment are
subject to a relaxed exhaustion requirement.  DOCCS directive
440 Section 701.31, which is in the N.Y.C.R.R. Title 7 says as
follows:  "Any allegation concerning an incident of sexual abuse
or sexual harassment shall be deemed exhausted if official
documentation confirms that:  An inmate who alleges being the
victim of sexual abuse or sexual harassment reported the
incident to facility staff; in writing to Central Office Staff;
to any outside agency that the Department has identified as
having agreed to receive and immediately forward inmate reports
of sexual abuse and sexual harassment to agency officials under
the PREA Standards, 28 C.F.R. Section 115.51(b); or to the
Department's Office of Inspector General."

        DOCCS has a separate and distinct process for inmates
to appeal the result of disciplinary hearings.  This is not a
grievance process.  *Kimbrough versus Fischer*, 2014 Westlaw

1  12684106 at page 6, Northern District, September 29, 2014.  See

2  7 N.Y.C.R.R. 701.3(e)(2), which explains that disciplinary

3  dispositions are not grievable.  Same in 70323.4(h).  "When an

4  inmate's federal claims arise directly out of a disciplinary or

5  administrative segregation hearing, he exhausts his

6  administrative remedies by presenting his objections in the

7  administrative appeals process."  *Williams versus Annucci*, 2018

8  Westlaw 3148362 at page 6, Southern District, June 27, 2018.

9          Specifically, the inmate has to appeal to the

10  Commissioner of DOCCS, who can then affirm, reverse, remand or

11  modify.  *Williams* at 6, citing 7 N.Y.C.C.R.

12  Section 254.8(a)-(d); see *David versus Barrett*, 576 F.3d 129 at

13  132.  Where an inmate claims both that there was official

14  misconduct in the events leading to the disciplinary hearing and

15  that the hearing itself was constitutionally flawed, he must

16  follow both DOCCS procedures, *Kimbrough* at 6, in other words,

17  the underlying event through the grievance process and the

18  disciplinary results through the appeal process.

19          Initially, defendants argued that plaintiff had failed

20  to exhaust his remedy for any of his claims.  That's at ECF

21  number 52 at page 6.  Frankly, I expect better of the attorney

22  general because plaintiff's amended complaint included the CORC

23  denial.  That's ECF 39-1 at page 39.  Further, the attorney

24  general's brief was filed well after *Hayes* was decided, so

25  defendants should not have been arguing that plaintiff filed the

1   lawsuit prematurely before CORC rendered its decision.  In any

2   event, defendants now concede in their reply at page 1 that

3   plaintiff grieved the alleged assault and battery and the

4   alleged sexual assault and failure to intervene claims, failure

5   to protect-slash-intervene claims, but they continue to argue

6   that plaintiff did not exhaust the alleged due process

7   violations, the alleged medical indifference claims, and the

8   alleged supervisory claims.  I am going to refer to those three

9   claims as the "at-issue claims."

10          Exhaustion is an affirmative defense, not a pleading

11   requirement, and thus inmate-plaintiffs don't need to

12   specifically plead or demonstrate exhaustion in their complaint.

13   *Jones versus Bock*, 549 U.S. 199 at 216.  Rather, defendants have

14   to show lack of exhaustion.  *Colón versus DOCCS*, 2017 Westlaw

15   4157372 at page 4, Southern District, September 15, 2017.

16   Relief may be granted on a Rule 12(b)(6) motion only when

17   failure to exhaust appears on the face of the complaint.  *Jamiel

18   versus Viveros*, 2020 Westlaw 1847566 at page 3, Southern

19   District, April 13, 2020; accord *Frederic versus NFC*, 2018

20   Westlaw 4735715 at page 2, Southern District, September 28,

21   2018.

22          Here, beyond plaintiff's signature on page 18 of the

23   amended complaint recognizing that he understands that prisoners

24   have to exhaust administrative remedies before filing a federal

25   action about prison conditions, the AC is silent as to whether

1  plaintiff exhausted his administrative remedies for the at-issue

2  claims.  Plaintiff notes that he filed grievances relating to

3  claims in a different case and that those grievances go to

4  C.O.R.C.  That's at page 8 of the AC, but those grievances are

5  obviously not at issue here.  The only relevant grievance that

6  plaintiff refers to in his AC is what he refers to as "Grievance

7  of GH-90072-18, hearing date 9/10/20 for the excessive force and

8  the sexual assault at the CORC Exhibit K."  That's in the AC at

9  14.  While the exhibits attached to the AC are not labeled,

10 making the Court's task much more difficult, the Court found the

11 documents to which plaintiff refers at ECF number 39-1 at pages

12 35 to 39, and at ECF number 60-1 at pages 2 to 7.

13       This grievance standing alone does not speak to

14 whether plaintiff exhausted his remedies for the at-issue

15 claims.  In other words, that a *pro se* plaintiff refers in his

16 AC to a grievance regarding a particular claim or claims is not

17 the equivalent of an affirmative statement that he did not file

18 other grievances or exhaust his administrative remedies for

19 other claims.

20       Where a plaintiff's pleadings are silent as to

21 administrative remedies taken, most other courts in this

22 District have found that the failure to exhaust is not apparent

23 from the face of the complaint or the documents properly

24 considered and have therefore denied similar motions to dismiss.

25 See *Tatas versus Ali Baba's*, 2020 Westlaw 2061539 at page 5,

1  Southern District, April 29, 2020; and *Frederic*, 2018 Westlaw,

2  4735715 at page 3.  Here, the AC is not completely silent as to

3  exhaustion, but it is silent with respect to exhaustion for the

4  at-issue claims, but in such circumstances, a district court

5  may, in its discretion, convert a motion to dismiss that

6  includes additional evidence beyond the pleadings into a motion

7  for summary judgment.  *Frederic* at page 3.  The court may do so

8  provided it gives sufficient notice and an opportunity for that

9  party to respond.  *Mathie v. Dennison*, 381 Fed. App'x 26 at 26.

10         Under certain circumstances, a court can convert

11  without giving explicit notice.  *Metrokane versus Wine*

12  *Enthusiast*, 185 F.Supp.2d 321 at 325, Southern District 2002.

13  The essential inquiry is whether the opposing party should

14  reasonably have recognized the possibility that the motion might

15  be converted into one for summary judgment or was taken by

16  surprise and deprived of reasonable opportunity to meet facts

17  outside the pleading.  *Gurary versus Winehouse*, 190 F.3d 37 at

18  43; see *Villante versus Department of Corrections*, 786 F.2d 516

19  at 521, and *Metrokane* at 325.  Here, plaintiff was on notice

20  that defendant was moving to dismiss on exhaustion grounds and

21  was even told at the pre-motion conference to include his CORC

22  appeal in his submissions.  Additionally, plaintiff attached

23  hundreds of pages of extrinsic evidence to his AC in opposition,

24  including many grievances, some that are not even relevant to

25  this case, suggesting that he submitted all of the grievances he

1  had filed.  Therefore, as to the issue of exhaustion only, I

2  convert the motion to one for summary judgment.

3          As I said earlier, standing alone, the fact that a *pro*

4  *se* plaintiff included one grievance in the AC is not the

5  equivalent of a statement that he did not file other grievances

6  and does not necessarily mean he didn't.  But when coupled with

7  the discussion at the pre-motion conference, the hundred pages

8  of exhibits the plaintiff did file, and plaintiff's argument in

9  his opposition, I find the record clear that plaintiff did not

10  exhaust his administrative remedies for his medical indifference

11  claim against defendant Uzu and his failure to intervene claim

12  against defendant Lamanna.

13          For example, plaintiff argues in his opposition papers

14  that, "In this case I would exhaust my state remedies by the

15  grievance going all the way to CORC," but he cites only Exhibits

16  E and F.  That's in his opposition at page 11.  That grievance

17  details the July 31st, 2018, incident, but does not refer in any

18  way to defendant Lamanna's failures or defendant Uzu's medical

19  indifference.  It doesn't refer to these defendants at all.

20  This is not say that an inmate needs to identify the responsible

21  parties in a grievance by name in order to later name them as

22  defendants, but the mere fact that plaintiff filed some

23  grievance and fully appealed all the decisions on that

24  grievance, does not automatically mean that he can sue anyone

25  who was in any way connected with the events giving rise to that

1  grievance.  See *Peters versus Huttel*, 2019 Westlaw 6619602 at

2  page 9, Southern District, December 5th, 2019.  A claim can be

3  exhausted when it is clearly associated with, even if not

4  explicitly mentioned in, an exhausted grievance.  *Percinthe*

5  *versus Julien*, 2009 Westlaw 2223070 Southern District July 24,

6  2019.  Nevertheless, the grievance must allow a claim to be

7  properly investigated and specifically addressed in the prison's

8  denial of the grievance.  *Peters* at page 9.  Here, plaintiff's

9  exhausted grievance did not allow the at-issue claims to be

10 properly investigated, see *Peters*, which found -- at page 9,

11 which found that plaintiff failed to exhaust because the

12 grievance did not lend itself to review of and decision on the

13 failure to protect claim, as all that was addressed was

14 excessive force.  *Percinthe v. Julien* at pages 5 to 6, which

15 similarly found a failure to protect claim not exhausted where

16 the grievance only alleged excessive force.  There being --

17 there is no other -- there is no indication that plaintiff filed

18 any other grievance regarding the at-issue claims.  It's

19 unlikely plaintiff would submit to this Court as many grievances

20 as he did, but hold the one or ones related to defendants Uzu

21 and Lamanna.  Thus, I agree with defendants that plaintiff

22 provides no documentation showing he exhausted his

23 administrative remedies, at least for the medical indifference

24 claims against Uzu, and the failure to intervene claim against

25 Lamanna.  See defendant's reply at 2.

1              Even though those claims are unexhausted, in an excess

2    of caution, I will address them on the merits in a minute.

3              With respect to plaintiff's due process claim against

4    Gutwein, which has to be exhausted via an appeal of the

5    disciplinary decision, I cannot say that plaintiff has failed to

6    exhaust.  He alleges and argues in his AC that he was not given

7    any disposition to appeal.  That's at page 11.  Defendants do

8    not seem to respond to this argument.  But the CORC disposition,

9    ECF 39-1 at page 39, says that plaintiff "was issued a Tier III

10   misbehavior report for his actions on 7/31/18, which was upheld

11   upon appeal by the Office of Special Housing/Inmate Discipline

12   on 11/28/18," which sounds like there was an appeal.  After the

13   motion was fully briefed, plaintiff filed ECF number 62, which

14   attached an exhibit entitled "Review of superintendent's

15   hearing," and argues that that document shows that

16   administrative remedies were exhausted.  It provides, "On behalf

17   of the commissioner and in response to your recent letter of

18   appeal, please be advised that your superintendent's hearing of

19   September 28, 2018, has been reviewed and affirmed on

20   November 28, 2018."  So it appears that plaintiff did appeal and

21   exhaust his due process claim.  I don't understand why the

22   attorney general, which must have had access to the same

23   document, argued otherwise.  So there is a failure to exhaust as

24   to Lamanna and Uzu, but not the due process claim against

25   Gutwein.

```
 1            In any event, turning to the merits of the claim
 2   against Lamanna, plaintiff argues in his opposition at pages 11
 3   to 12 that Lamanna knew of the violations through a report and
 4   the appeal process; that he knew of the injuries through
 5   grievances; that he created the policy under which
 6   unconstitutional practices occurred, and that he was grossly
 7   negligent in supervising subordinates.  The AC at page 11 says
 8   that Lamanna got a letter and saw plaintiff's stitches in his
 9   eyes during daily go-arounds, and defendants argue in their
10   reply at page 3 that plaintiff's mere speculation that Lamanna
11   knew of the alleged violation is insufficient to show
12   supervisory liability.
13            It's well settled in this Circuit that personal
14   involvement of the defendant in an alleged constitutional
15   deprivation is a prerequisite to an award of damages under
16   Section 1983.  *Colon versus Coughlin*, 58 F.3d 865 at 873.  While
17   *Colon* laid out a special test for supervisory liability
18   outlining five ways a plaintiff could show personal involvement
19   of a supervisor, the Second Circuit recently clarified that
20   under the Supreme Court's ruling in *Iqbal*, the *Colon* test is
21   invalid, and a plaintiff has to plead and prove that each
22   government official defendant through the official's own
23   individual actions has violated the Constitution.  *Tangreti*
24   *versus Bachmann*, 983 F.3d 609 at 618.  Because *Tangreti*
25   overruled *Colon*, I do not understand how the attorney general
```

1  could have quoted and argued the *Colon* test or why it would

2  because the *Tangreti* test is so much more favorable to the

3  defendants.  It does not fill me with confidence when parties

4  repeat outdated boilerplate and aren't aware of the recent law

5  governing the claim.  In any event, merely being in the chain of

6  command is not enough to satisfy the applicable standard under

7  *Tangreti* at 18.  While the factors necessary to establish a 1983

8  violation will vary with the constitutional provision at issue,

9  because the elements of different constitutional violations

10 vary, the violation must be established against that official

11 directly.  See *Tangreti* at 16.

12         Here, the Eighth Amendment requires prison officials

13 to take reasonable measures to guarantee the safety of inmates

14 in their custody.  *Hayes versus New York City Department of*

15 *Corrections*, 84 F.3d 614 at 620, citing *Farmer v. Brennan*, 511

16 U.S. 825 at 833.  To prevail on the failure to protect claim, a

17 plaintiff must demonstrate that objectively the conditions of

18 his incarceration posed a substantial risk of serious harm, and

19 subjectively that the defendant acted with deliberate

20 indifference.  *Farmer* at 834, *Hayes* at 620.

21         A prison official has sufficient culpable intent if he

22 knows the inmate faces a substantial risk of serious harm, and

23 he disregards that risk by failing to take reasonable measures

24 to abate the harm.  *Hayes* at 620.  A plaintiff must show that

25 prison officials actually knew of, but disregarded, an excessive

1  risk to his safety.  In other words, the official must both be

2  aware of facts from which the inference could be drawn that a

3  substantial risk of harm exists, and he must also draw the

4  inference.  *Farmer* at 837; see *Tangreti* at 619.

5         That defendant Lamanna knew of the alleged violations

6  after the fact is insufficient to show the supervisory

7  liability.  See *Allah versus Annucci*, 2018 Westlaw 4571679 at

8  page 6, Southern District, September 14, 2018; *Alvarado versus*

9  *Westchester*, 22 F.Supp.3d 208 at 215, Southern District 2014;

10  *Smith versus Connecticut Department of Corrections*, 2007 Westlaw

11  678549 at page 4, District of Connecticut, March 1, 2007,

12  collecting cases; *Bennett v. Hunter*, 2006 Westlaw 1174309 at

13  page 6 and note 33, Northern District, May 1st, 2006; also

14  collecting cases.  All of those cases stand for the fact that

15  merely getting a letter or a complaint after the fact is not

16  enough to show personal involvement.  If it were, it would

17  impose liability on supervisors just for being a supervisor, and

18  1983 does not do that.  Like the plaintiff in *Woodson versus*

19  *Superintendent of Green Haven*, 2021 Westlaw 431444 at page 2,

20  Southern District, February 4th, 2021, a case that plaintiff

21  cites, plaintiff "Does not allege any facts showing how [the

22  defendant at issue] was personally involved in the event

23  underlying the claim."

24         Plaintiff argues in his opposition at page 11 that

25  Lamanna allowed the continuance of the defendants to hurt and

1  threaten to kill, and cites documents that, as defendants

2  correctly argue, were not even addressed to or sent to Lamanna.

3  Defendants' reply at 3.  While courts have found that when an

4  inmate informs corrections officers about a specific fear of

5  assault and is then assaulted, it's sufficient to proceed on a

6  claim of failure to protect.  *Beckles v. Bennett*, 2008 Westlaw

7  821827 at page 17, Southern District, March 26, 2008, collecting

8  cases.  This is true even where that assault was allegedly

9  committed by another prison official, *Albritton versus Morris*,

10 2016 Westlaw 1267799 at page 13, Southern District, March 30,

11 2016.  Plaintiff does not allege that Lamanna was aware of any

12 specific fear of assault.  If anything, plaintiff's submission

13 suggests that Lamanna learned of the alleged misconduct through

14 grievances or observations after the alleged misconduct took

15 place and after the plaintiff was injured.  As the Court

16 explained in *Bobbit versus Marzan*, 2020 Westlaw 5633000,

17 Southern District, September 21, 2020, at page 7, another case

18 plaintiff cites, "an officer is liable for failing to intervene

19 to prevent a constitutional violation if the officer observes or

20 has reason to know that any constitutional violation has been

21 committed by another official and has the realistic opportunity

22 to intervene to prevent it."  Because plaintiff alleges that

23 Lamanna learned of the misconduct after it took place, he could

24 not have prevented it, and any inaction on his part could not

25 have caused plaintiff's injury.

1          So plaintiff's claims against Lamanna would be

2    dismissed even if they were exhausted.  This ruling should not

3    come as a surprise to plaintiff based on the discussions we had

4    at the pre-motion conference where I explained about supervisory

5    liability.

6          Turning now to the merits of the plaintiff's claim

7    against defendant Uzu.  The Eighth Amendment imposes a duty on

8    prison officials to ensure that sentenced inmates receive

9    adequate medical care.  See *Farmer* at 832.  But not every lapse

10   in medical care is a constitutional wrong.  Rather, a prison

11   official violates the Eighth Amendment only when those two

12   objective or subjective requirements are met.  *Salahuddin versus*

13   *Goord*, 467 F.3d 263 at 279.

14         First, the prisoner must show objectively that he was

15   actually deprived of adequate medical care, as the prison

16   official's duty is only to provide reasonable care.  *Salahuddin*

17   at 279, citing *Farmer* at 844 to 47; and the defendant -- and the

18   plaintiff has to show objectively that the alleged deprivation

19   of medical treatment was sufficiently serious.  That is, that he

20   had a medical need of urgency, one that could produce death,

21   degeneration or extreme pain.  *Johnson versus Wright*, 412 F.3d

22   398 at 403, quoting *Hathaway v. Coughlin*, 99 F.3d 550 at 553;

23   see *Williams versus Raimo*, 2011 Westlaw 6026115 at page 3,

24   Northern District, July 22, 2001, which says there is no

25   distinct litmus test for determining whether a condition is

1 serious, but courts look to a list of factors, including whether

2 the impairment is one that a reasonable doctor would find worthy

3 of treatment; whether it affects the individual's daily life;

4 and whether it causes chronic and substantial pain.  Where the

5 alleged inadequacy is that medical treatment was -- sorry.  Let

6 me try that again.  Where the inadequacy alleged is in the

7 medical treatment given, the seriousness inquiry is narrower.

8 *Goris versus Breslin*, 402 F. App'x 582 at 584, and the focus is

9 on the alleged inadequate treatment, not on the underlying

10 condition alone.  *Sanders versus City of New York*, 2018 Westlaw

11 3117508 at page 8, Southern District, June 25, 2018.

12          Specifically, the court has to consider the

13 effectiveness of the treatment and the harm that resulted from

14 the alleged shortfall.  *Sanders* at page 8.  If the prisoner is

15 getting ongoing treatment, and the offending conduct is an

16 unreasonable delay or interruption in treatment, the serious

17 inquiry focuses on the delay or interruption rather than the

18 underlying condition.  *Goris* at 584 to 85; see *Smith v.*

19 *Carpenter*, 316 F.3d 178 at 186 to 87.  That's the objective

20 prong.

21          For the subjective prong, the prisoner has to show

22 that the charged official acted with a sufficiently culpable

23 state of mind.  *Salahuddin* at 280 to 81; see *Farmer*, 511 U.S. at

24 835, which explains that deliberate indifference is more than

25 mere negligence, but it's something less than acting for the

1  very purpose of causing harm or a knowledge that harm will

2  result.  The prisoner has to show that the charged official knew

3  of and disregarded an excessive risk to inmate's health or

4  safety; the official must have been aware of facts from which

5  the inference of such a risk could be drawn and must also have

6  drawn the inference.  *Johnson*, 412 F.3d at 403; see *Phelps*

7  *versus Kapnolas*, 308 F.3d 180 at 186, equating deliberate

8  indifference with criminal recklessness.

9           It's well established that mere disagreement over the

10 proper treatment nor medical malpractice are constitutional

11 violations merely because the victim is a prisoner.  See *Chance*

12 *versus Armstrong*, 143 F.3d 698 at 703; *Estelle v. Gamble*, 429

13 U.S. 97 at 106; *Sonds versus St. Barnabas*, 151 F.Supp.2d 303 at

14 312, Southern District 2001, which says that disagreements over

15 medications, diagnostic techniques, forms of treatment, or the

16 need for specialists or the timing of their intervention are not

17 adequate grounds for a Section 1983 claim because they implicate

18 medical judgments, and at worst, negligence amounting to medical

19 malpractice, but not the Eighth Amendment; *cf Choice versus*

20 *Blackwell*, 2002 Westlaw 32079466 at page 7, District of South

21 Carolina, March 29, 2002 where the court said, the provision of

22 medical care by prison officials is not discretionary, but the

23 type and amount of medical treatment is discretionary.  So to

24 state an Eighth Amendment deliberate indifference claim, the

25 inmate has to show that the defendants acted or failed to act

1  while actually aware of a substantial risk to serious inmate

2  harm would result.  *Farid versus Ellen*, 593 F.3d 233 at 248.

3  Officials will be found free from liability if they responded

4  reasonably to the risk, even if the harm was not ultimately

5  averted.  *Farmer* at 844.

6          While plaintiff's allegations regarding Dr. Uzu are

7  far from clear, it seems that plaintiff takes issue with Dr. Uzu

8  cancelling an MRI and scheduling a CT, but the law is clear that

9  a medical decision about whether to order a test is not an

10 Eighth Amendment violation, and at most, medical malpractice,

11 which can be properly addressed under state court law.  *Youmans*

12 *versus City of New York*, 14 F.Supp.3d 357 at 363, Southern

13 District 2014.

14         Plaintiff also seems to take issue with the fact that

15 Dr. Uzu did not issue him any permit while he was in the SHU,

16 but based on the allegations in the AC at page 5, the failure to

17 issue a permit for plaintiff's shoulder seems to be the subject

18 of another one of plaintiff's 1983 actions against other

19 defendants.  See ECF number 39-2 at 4, which relates to events

20 preceding the July 31st, 2018 incident.  To the extent plaintiff

21 alleges here that Dr. Uzu should have issued him a permit for

22 his shoulder, that is a disagreement over proper treatment,

23 which is not a constitutional violation, and in any event,

24 plaintiff sets forth no facts showing that Dr. Uzu's treatment

25 of him was accompanied by the requisite state of mind.

1          For these reasons, the claims against Dr. Uzu would be

2   dismissed even if they were exhausted.

3          I also agree with defendants that to the extent

4   plaintiff intended to plead a medical indifference claim against

5   defendant Lamanna, the bald conclusions with no factual basis do

6   not adequately plead a constitutional violation.

7          I will now address whether plaintiff plausibly states

8   a claim for due process of violation against defendant Gutwein.

9   To survive a motion to dismiss, the plaintiff must plead that

10  the state has created a protected liberty interest and the

11  process due was denied.  *Wright versus Coughlin*, 132 F.3d 133 at

12  136.

13         Defendant does not dispute that plaintiff has pleaded

14  a protected liberty interest, which was a wise choice because

15  where plaintiff is in the SHU for an intermediate duration of

16  between 101 and 305 days, development of a detailed record

17  regarding the conditions of confinement as compared to ordinary

18  prison conditions is required.  *Chavez v. Gutwein*, 2021 Westlaw

19  4248917 at page 7, Southern District, September 17, 2021.  This

20  is a fact-intensive inquiry.  *Farmer versus Richard*, 364 F.3d 60

21  at 65, and ordinarily can't be addressed on a motion to dismiss.

22  *Chavez* at page 7, collecting cases.  See *Mena versus Gutwein*,

23  2020 Westlaw 5370708 at page 5, Southern District, September 8,

24  2020.

25         So I turn to whether plaintiff was afforded

1 constitutionally sufficient process.  Prison inmates do not get

2 the full panoply of rights due to a defendant in a criminal

3 prosecution.  Nevertheless, an inmate is entitled to advance

4 written notice of the charges against him, a hearing affording

5 him a reasonable opportunity to call witnesses and present

6 documentary evidence, a fair and impartial hearing officer, any

7 written statement of the disposition, including the evidence

8 relied upon, and the reasons for the disciplinary action taken.

9 *Sira versus Morton*, 380 F.3d 57 at 69.

10          The disciplinary action must be supported by at least

11 some reliable evidence.  *Sira* at 69, Smith *v. Arnone;* 700 Fed.

12 App'x 55 at 56; *Smith versus DOCCS*, 2018 Westlaw 2305566 at

13 page 4, Southern District, May 21, 2018; appeal dismissed 2018

14 Westlaw 6579309, October 3rd, 2018.

15          Whether the "some evidence" standard is satisfied,

16 "does not require examination of the entire record, independent

17 assessment of the credibility of witnesses, or weighing of the

18 evidence.  Instead, the relevant question is whether there is

19 any evidence in the record that could support the conclusion

20 reached by the disciplinary board."  *Gaston versus Coughlin*, 249

21 F.3d 156 at 163.

22          The inmate facing disciplinary proceedings should be

23 allowed to call witnesses and present documentary evidence in

24 his defense when allowing him to do so will not be unduly

25 hazardous to institutional safety or correctional goals.  *Wolff,*

1  418 U.S. at 566.  But the right to call witnesses or present

2  documents can be denied on the basis of irrelevance or lack of

3  necessity.  *Kingsley vs. Bureau of Prisons*, 937 F.2d 26 at 30;

4  and *Richardson versus Williams*, 2017 Westlaw 4286650 at page 9,

5  Southern District, September 26, 2017; and that right is

6  circumscribed by the penological need to provide swift

7  discipline in individual cases.  *Ponte versus Real*, 471 U.S. 491

8  at 495.  Any violations of an inmate's qualified right to call

9  witnesses or present evidence or present documents are reviewed

10  for harmless error.  *Pilgrim versus Luther*, 571 F.3d 201 at 206.

11  So the inmate must show that he was prejudiced by the alleged

12  procedural errors in the sense that the errors affected the

13  outcome of the hearing.  *Colantuono versus Hockeborn*, 801

14  F.Supp.2d 110 at 114, Western District 2011.

15        Plaintiff alleges that defendant Gutwein violated the

16  due process clause through -- in five different ways:  By

17  excluding or not providing him with requested audio or video

18  footage; by allowing only four out of 11 or 10 witnesses to

19  testify; by acting partially, or arbitrarily and capriciously;

20  by providing plaintiff with photos after the hearing and by

21  secretly calling witness outside of the plaintiff's presence.

22  See ECF Number 39 at page 11.

23        I will start with plaintiff's allegation that he did

24  not get any footage of Camera 33 or 192 or 191 despite his

25  requests, and that he was allowed to call only four witnesses.

 1          Defendants assert in their brief at page 17 that

 2   Gutwein considered all of that to be irrelevant or duplicative.

 3   As discussed, it's not a due process violation to exclude

 4   irrelevant or duplicative evidence or testimony at a

 5   disciplinary hearing.  *Pooler versus Mussaw*, 2015 Westlaw 272276

 6   at page 3, Southern District, January 19, 2015; *Holland versus*

 7   *Goord* 758 F.3d 215 at 225; *Kingsley*, 937 F.2d at 30; *Albritton*

 8   *versus Morris,* 2018 Westlaw 1609526 at 15, Southern District,

 9   March 29, 2018.  I will not take the time to recite the portions

10   of the hearing transcript that defendants cite in support of

11   their argument because the transcript contains several notations

12   that it's unintelligible, and because in any event, I cannot

13   consider Gutwein's statements in the transcript for their truth;

14   but it's clear to the Court that Gutwein's stated reasons for

15   excluding the videos is that they were irrelevant because they

16   did not show the use of force.  And his stated reason for

17   excluding the witnesses was that they were irrelevant because

18   they had not seen the use of force or they were duplicative.

19          For example, in the transcript at page 36, Gutwein

20   said, "As for the video, the SHU and the elevator to the SHU as

21   well as the video of the mental health that you're being denied,

22   they are not...to the incident alleged in the misbehavior report

23   as the video itself is not of the incident, and therefore, it

24   wouldn't be relevant to the incident alleged in the report

25   regarding producing video on the date of the incident."

1          What remains less clear to me is what the additional

2   witnesses would have testified and what the audio/video would

3   have shown.  Even in the transcript of the hearing when

4   plaintiff is arguing with Gutwein about these issues, he does

5   not make clear what the recording or witnesses would have added

6   to the proceedings, and he makes no effort to do so in his

7   complaint, AC or opposition.  He has not alleged, argued or

8   otherwise put forth any valid reasons for receiving the audio or

9   video or for calling the additional witnesses.  See *Young versus*

10  *Freer*, 829 F.Supp. 32 at 34, Northern District 1993.  He doesn't

11  allege facts suggesting that the excluded witnesses would have

12  provided additional or unique testimony that would not have been

13  redundant and would have bolstered his defense.  *Colon versus*

14  *Annucci*, 344 F.Supp.3d 612 at 666, Southern District, 2018.

15          Accordingly, he has not plausibly alleged a due

16  process violation based on the excluded audio and video or

17  witnesses.

18          That said, because plaintiff might be able to do so,

19  see *Cook versus Dubois*, 2021 Westlaw 91293 at page 7,

20  January 11, 2021 which says, in some circumstances, refusing to

21  show an inmate security footage of the incident in question may

22  present due process issues.  I will allow plaintiff to amend to

23  add facts to this part of his amended complaint if he can show

24  that the audio or video footage would have included the uses of

25  force about which he complains, but he should only amend if he

1  can do that; if he can add facts suggesting that the videos are

2  of the instant or otherwise relevant and unique, meaning not

3  redundant or duplicative.  The same goes for the additional

4  witnesses plaintiff wanted to call.  He must explain what their

5  testimony would have been and why it was relevant and not

6  duplicative.

7          Turning now to the photographs.  Plaintiff alleges he

8  was given photographs after the hearing was over.  AC at 11.

9  But defendants correctly argue in their brief at pages 18 to 19

10 that he provides no explanation or argument regarding what those

11 photographs depict and how they were relevant to the hearing or

12 somehow show bias on Gutwein's part.  Plaintiff intimated at the

13 hearing that the photos somehow show that a witness was lying,

14 but as they were before the hearing officer during the hearing,

15 see ECF 39-4 at pages 27 to 28, I fail to see how the later

16 production of copies to plaintiff plausibly deprived him of due

17 process.

18         Plaintiff also alleges in a general fashion that

19 Gutwein was biased, arbitrary and capricious.  AC at 11 at 15.

20 Those conclusory allegations are insufficient to sustain a due

21 process claim.  See *Jabot versus NHU Counsel Roszel*,

22 2016 Westlaw 6996173 at page 9, Southern District, November 29,

23 2016, which says, claims of hearing officer bias are common in

24 Section 1983 cases by inmate plaintiffs, and where they are

25 based on purely conclusory allegations, they are routinely

 1  dismissed, and that is the case here.

 2          Finally, plaintiff alleges that he was not allowed in

 3  the room to confront Polito while Polito was testifying.  That's

 4  in the AC at 15.  Defendants in their brief at page 18 citing

 5  Exhibit A at page 4 -- or the transcript at page 4, argue that

 6  the transcript reflects "that on the day that defendant Polito

 7  testified, Mr. Girard stated that he did not wish to remain at

 8  the hearing."  What the hearing transcript actually reflects is

 9  that Polito said that plaintiff said he did not wish to remain

10  at the hearing.  I do not consider what the witnesses said in

11  that transcript for the truth of the matters asserted.

12  Regardless, plaintiff fails to plead a due process violation on

13  these facts because there is no right to confrontation in prison

14  disciplinary hearings.  See *Sira* at 69; *Hadden v. Mukasey* 2008

15  Westlaw 2332344 at page 3, Southern District, June 3rd, 2016.

16  Nor does plaintiff explain what argument he could have made had

17  he been present that he was not able to make.

18          So for the above reasons, the due process claim is

19  dismissed with leave to replead as to the audio/video and the

20  witnesses if plaintiff has facts that would cure the defects

21  identified in this ruling.

22          Turning now to the conspiracy claim.  Plaintiff says

23  that Gutwein conspired with Polito to give false testimony at

24  his hearing.  That's in the AC at 15.

25          To prove a conspiracy, plaintiff has to show an

1  agreement between two or more state actors, or between a state

2  actor and a private entity, to act in concert to inflict an

3  unconstitutional injury, and an overt act in furtherance of that

4  goal causing damages.  *Pangburn versus Culbertson*, 200 F.3d 65

5  at 72; see *Biswas versus City of New York*, 973 F.Supp.2d 504 at

6  532 to 33.  Conspiracies by their nature are secretive, and they

7  have to be proven by circumstantial evidence.  *Pangburn*, 72.

8  Nevertheless, complaints with only conclusory, vague or general

9  allegations that a conspiracy to deprive plaintiff of

10 constitutional rights are properly dismissed; diffuse and

11 expansive allegations are insufficient unless amplified by

12 specific instances of misconduct.  *Ciambriello versus County of*

13 *Nassau*, 292 F.3d 307 at 325.  In other words, the complaint must

14 have sufficient factual matter taken as true to suggest an

15 agreement was made.  *Twombly* at 552.

16         The conspiracy claim here is dismissed for essentially

17 the same reasons set forth in defendants' memorandum of law at

18 pages 19 to 20.  Plaintiff's allegations regarding the alleged

19 conspiracy are conclusory.  He fails to specify in any detail

20 the factual basis for the claim.  *Ciambriello* at 325; *Romer*

21 *versus Morgenthau*, 119 F.Supp.2d 346 at 353, Southern District

22 2000.  There are no facts showing an agreement, and the presence

23 of Gutwein and Polito at the hearing is insufficient.  See *Warr*

24 *versus Liberatore*, 270 F.Supp.3d 637 at 650, Western District

25 2017.

1          Further, plaintiff does not respond as to the

2   conspiracy claim in his opposition papers, so any such claim may

3   also be dismissed as abandoned.  See *Martinez versus City of New*

4   *York*, 2012 Westlaw 6062551 at page 1, Southern District,

5   December 6, 2012; and *Rodriguez versus City of New York*, 2012

6   Westlaw 1059415 at page 13, Eastern District, March 28, 2012;

7   and *Brandon versus City of New York*, 705 F.Supp.2d 261 at 268,

8   Southern District 2010, collecting cases.

9          I will now address the sexual abuse claim against

10  Polito.  Sexual abuse of a prisoner by a corrections officer may

11  in some circumstances violate the prisoner's right to be free

12  from cruel and unusual punishment.  *Boddie versus Schnieder*, 105

13  F.3d 857 at 862.  The principle inquiry is whether the contact

14  is incidental to legitimate official duties, such as a

15  justifiable pat-frisk or strip search, or by contrast whether it

16  was undertaken to arouse or gratify the officer or humiliate the

17  inmate.  *Crawford versus Cuomo*, 796 F.3d 252 at 257 to 58.  To

18  state a claim, a prisoner must allege two elements, one

19  subjective and one objective.  First, the prisoner must allege

20  that the defendant acted with a sufficiently subjectively

21  culpable state of mind; and second, that the contact was

22  objectively harmful or serious enough to reach constitutional

23  dimensions.  *Crawford* at 256.

24          With respect to the objective prong, severe or

25  repetitive sexual abuse of an inmate by a prison official can be

1  objectively, sufficiently serious enough to constitute an Eighth

2  Amendment violation.  *Washington versus Fitzpatrick*, 2021

3  Westlaw 966085 at page 4, Southern District, March 15, 2021.

4  Even a single incident of sexual abuse is sufficiently severe or

5  serious and may violate an inmate's Eighth Amendment rights no

6  less than repetitive abuse can.  *Crawford* at 257.  The objective

7  inquiry is context specific, turning on contemporary standards

8  of abuse.  *Campbell versus Trew*, 2021 Westlaw 3292226 at page 6,

9  Southern District, July 30, 2021.

10         The subjective element may be where there is no

11 legitimate law enforcement or penological purpose that can be

12 inferred from the defendant's conduct, and sometimes the abuse

13 itself may be sufficient to evidence a culpable state mind.

14 *Boddie*, 105 F.3d at 861.  To the determine the purpose of the

15 jail official's conduct, courts look to the timing and to

16 comments made by the official.  *Washington*, 2021 Westlaw 966085

17 at page 4.

18         Plaintiff here, putting together all of his

19 allegations, alleges that Polito pushed plaintiff against the

20 wall, grabbed plaintiff's genitals with his bare hands, played

21 with his genitals by stroking them and said, "Nice."  Plaintiff

22 also alleges that the assault lasted for five minutes.

23 Defendants argue the alleged genital touching was part of a

24 legitimate pat-frisk and done for proper penological purposes.

25 That may be so, but it is not inferable from the complaint.

1  It's an argument that will have to be addressed at summary

2  judgment or more likely trial.  Plaintiff provides enough facts

3  taken as true, as I must at this stage, to plausibly suggest a

4  serious sexual assault without a law enforcement purpose.  A

5  factfinder might find the facts alleged by plaintiff to be

6  farfetched, but that is not a ground on which I can dismiss.

7          *Washington versus Fitzpatrick*, a case on which

8  defendants rely is distinguishable.  There, the plaintiff

9  alleged that the officer squeezed and fondled the plaintiff's

10  testicles and manipulated his penis away from his testicles

11  during a frisk, which is conduct that seems necessary to

12  frisking that area.  Here, plaintiff at the disciplinary hearing

13  seemed to concede that the sexual assault occurred during a

14  pat-frisk, ECF 39-4 at 14, but he alleges way more than a single

15  fondling or manipulation that would be a necessary part of a

16  body search of a prisoner.  He claims five minutes of stroking

17  and a comment that, if not meant sarcastically to humiliate,

18  could signal gratification.  So the sexual assault claim

19  survives.

20          Plaintiff also brings a failure to intervene claim

21  against Elmore.  He says that Elmore watched the physical and

22  sexual assault and did nothing to protect him.

23          It's widely recognized that all law enforcement

24  officials have an affirmative duty to protect the constitutional

25  rights of citizens from infringement by other law enforcement

1    officers in their presence.  *J.H. versus City of Mount Vernon*,

2    2019 Westlaw 1639944 at page 5, Southern District, April 15,

3    2019.  Liability attaches when the officer has a realistic

4    opportunity to intervene and prevent the harm; a reasonable

5    person in the officer's position would know that the victim's

6    constitutional rights were being violated; and the officer

7    doesn't take reasonable steps to intervene.  *McClean versus*

8    *County of Westchester*, 2018 Westlaw 6329420 at 19, Southern

9    District, December 3rd, 2018, affirmed 776 Fed. App'x 725.  But

10   there has to be a realistic opportunity to intervene to prevent

11   that harm.  *Anderson versus Branen*, 17 F.3d 552 at 557.

12           I explicitly told plaintiff at the pre-motion

13   conference that he needed to be specific about who had the

14   opportunity to intervene and why they had the opportunity to

15   intervene.  Defendant doesn't say anything about why Elmore had

16   that opportunity beyond arguing that she did.  He does not say

17   where she was located or if that location changed during the

18   sexual assault or the beating, but he provides a transcript of

19   her testimony, and in combination with these other allegations,

20   that provides just enough to infer that she plausibly had a

21   realistic opportunity to intervene.  Elmore, who is erroneously

22   called "Elmer" in the transcript, seems to concede that she was

23   present from the time plaintiff left his cell through the time

24   Polito used force and sprayed the plaintiff; although she says

25   that occurred because plaintiff was yelling and screaming and

1   eventually head-butted Polito.  That's in the transcript at

2   pages 12 to 16.  Interpreting plaintiff's allegations to raise

3   the strongest arguments they suggest, I find that plaintiff has

4   plausibly alleged a failure to intervene claim, and specifically

5   a reasonable opportunity for Elmore to intervene, based on his

6   allegation that he was sexually assaulted for five minutes and

7   punched multiple times by several officers who joined in turn,

8   and that during this time he asked Elmore her name, which is in

9   the AC at pages 5 and 9, combined with Elmore's admission that

10  she was present for the entire encounter between plaintiff and

11  Polito.

12          Now I'll turn to the First Amendment Retaliation

13  claim.  Just one second.

14          To prove a First Amendment Retaliation claim, a

15  prisoner has to show that the speech or conduct at issue was

16  protected; that the defendant took adverse action against the

17  plaintiff; and there was a causal connection between the

18  protected speech and the adverse action.  *Espinal versus Goord*,

19  558 F.3d 119 at 128.  Because virtually any adverse action taken

20  against a prisoner by a prison official -- even though it's not

21  otherwise rising to the level of a constitutional violation --

22  could be characterized as a retaliatory act, the Second Circuit

23  has told district courts to approach prisoner retaliation claims

24  with skepticism and particular care.  *Stapleton v. Pagano*, 2020

25  Westlaw 4606320 at page 6, August 11, 2020.  I think that's

1  Southern District.

2          I turn first to the claim as alleged in the AC.

3  There, plaintiff alleges that Blot, Polito and Rios assaulted

4  him because he -- because he had filed a "pending 1983

5  18-cv-2026 for deliberate indifference."  That's in the AC at

6  12.  Defendants don't dispute that a lawsuit is protected

7  conduct or that getting beaten up is an adverse action, but they

8  argue that plaintiff failed to plead a causal connection between

9  the two.  I agree.

10          "To allege a causal connection, the plaintiff must

11  demonstrate that the protected conduct was a substantial or

12  motivating factor for the adverse actions taken by prison

13  officials."  *Washington versus City of New York*, 2019 Westlaw

14  2120524 at page 34, Southern District, April 30, 2019.  Here,

15  plaintiff provides no facts supporting his conclusions that the

16  defendant assaulted plaintiff because he filed a lawsuit.  In

17  other words, he does not tie the complaint in his pending 1983

18  action, which he filed on March 6, 2018, to the July 31, 2018,

19  assault.

20          Defendants Blot, Polito and Rios are not defendants in

21  the 1938 medical indifference action, and plaintiff does not

22  provide any facts suggesting these defendants were even aware of

23  that pending action such that his protected conduct, the filing

24  of the lawsuit, could plausibly be a substantial or motivating

25  factor for the adverse action.  *Bennett versus Goord*, 343 F.3d

1  133 at 137.   "Generally, alleged retaliation motivated by an

2  action the prisoner took which did not personally involve the

3  prison officials is insufficient for a retaliation claim."

4  *Quick versus Minale*, 2016 Westlaw 6124495 at page 7, Northern

5  District, October 20, 2016; see *Wright versus Goord*, 554 F.3d

6  255 at 274; and *Jones v. Fischer*, 2013 Westlaw 5441353 at

7  page 21, Northern District, September 27, 2013; and *Bryant*

8  *versus Goord*, 2002 Westlaw 553556 at page 2, Southern District

9  2002.

10         Even if the assaulting defendants were aware of

11  plaintiff's prior complaints against different defendants, that

12  alone would not suffice to plausibly allege that the earlier

13  1983 complaint was the reason for the assault.  See the same

14  cases just cited and *Hare versus Hayden*, 2011 Westlaw 1453789 at

15  page 4, Southern District, April 14, 2011, which said, As a

16  general matter, it is difficult to establish one defendant's

17  retaliation for complaints against another defendant; *Roseboro*

18  *versus Gillespie*, 791 F.Supp.2d 353 at 359, Southern District

19  2011, which says that even assuming one officer knew about the

20  plaintiff's grievance against another officer, plaintiff didn't

21  provide any basis to believe that the first officer retaliated

22  to the grievance that she wasn't named in.

23         Temporal proximity can provide an inference of causal

24  connection.  The Second Circuit, "has not drawn a bright line to

25  define the outer limits beyond which a temporal relationship is

1  too attenuated to establish a causal relationship." *Corman-*
2  *Bakos versus Cornell*, 252 F.3d. 545 at 554, but it has suggested
3  that six months or less will suffice.  *Hayes*, 2017 Westlaw
4  9511178 at page 9; citing *Espinal versus Goord*, 558 F.3d 119 at
5  129; and that case report and recommendation was adopted as
6  modified at 2018 Westlaw 555543, January 19, 2018.

7          Here, the time between the filing of the 1983 case and
8  the assault was between four and five months, but because
9  "prisoner retaliation claims are easily fabricated and pose a
10 substantial risk of unwarranted judicial intrusion into matters
11 of general prison administration," the Second Circuit, while
12 holding "that temporal proximity between protected conduct and
13 an adverse action constitutes circumstantial evidence of
14 retaliation," has "consistently required that some further
15 evidence of retaliatory animus before permitting a prisoner
16 proceed to trial on a retaliation claim." *Faulk versus Fisher*,
17 545 F. App'x 56 at 58.  While at this stage plaintiff need only
18 plausibly allege retaliatory animus, he has not done so here
19 where all he has is temporal proximity without a basis for
20 attributing knowledge of the protected activity to the
21 defendants or any other indication of a retaliatory state of
22 mind on their parts.

23         In his opposition, plaintiff seems to put forth a new
24 retaliation theory; that he was denied medical attention due to
25 his pending 1983 action.  See plaintiff's opposition at page 7.

1  But again, he fails to show a nexus between the protected

2  activity of filing the lawsuit and the retaliatory conduct

3  regardless of whether I consider the latter to be the assault or

4  the failure to attend to plaintiff's emergency sick call request

5  because, again, there are no facts rendering it plausible that

6  the defendants who do not take plaintiff to medical were aware

7  of the prior 1983 lawsuit.

8          I don't interpret the opposition to be an attempt to

9  enter new defendants to the case, but to the extent plaintiff

10  intends to bring claims against Dr. Bentivenga or Provider

11  Korobkova, defendants are correct in their reply at 3 when they

12  say that conduct by these persons can't be the predicate for the

13  plaintiff's retaliation claims because they are not defendants

14  in this case, but rather are defendants in 18-cv-2026.

15          So the First Amendment Retaliation claim is dismissed.

16          Turning to leave to amend, it should be freely given

17  when justice so requires under Rule 15.  It's within the

18  discretion of the district judge to grant or deny leave to

19  amend. *Kim versus Kim,* 884 F.3d 98 at 105.  Though liberally

20  granted, leave to amend can be properly denied for undue delay,

21  bad faith, dilatory motive, repeated failure to cure

22  deficiencies by amendments previously allowed, undue prejudice,

23  and futility. *Ruotolo versus City of New York*, 514 F.3d 184 at

24  191.

25          Plaintiff has already amended his complaint after

1  having the benefit of the pre-motion letter from defendants

2  outlining the proposed grounds for dismissal and the discussion

3  at the pre-motion conference.  In general, failure to fix

4  deficiencies in the previous pleading, after being provided

5  notice of them, is alone sufficient grounds to deny leave to

6  amend.  See *National Credit Union v. U.S. Bank*, 898 F.3d 243 at

7  257 and 58; *In re:  Eaton Vance*, 380 F.Supp.2d 222 at 242,

8  Southern District, 2005; affirmed 481 F.3d 110 at 118.

9          Further, plaintiff has not asked to amend again or

10 otherwise suggested he has facts that would cure the

11 deficiencies identified in this ruling.  See *TechnoMarine versus*

12 *Giftports*, 758 F.3d 493 at 505; *Gallop v. Cheney*, 642 F.3d 364

13 at 369; *Porat versus Lincoln Towers*, 464 F.3d 274 at 276; see

14 also *Loreley Financial versus Wells Fargo*, 797 F.3d 160 at 190.

15 So I will not grant leave to amend *sua sponte* except as

16 discussed.  I will allow plaintiff to amend his due process

17 claim, but only with respect to the excluded audio/video and

18 witnesses.

19         So the motion is dismiss is granted in part and denied

20 in part.

21         The clerk should terminate ECF Number 51 and Lamanna

22 and Uzu as defendants.

23         Now we need to set a schedule.  The remaining claims

24 are the excessive force claims, the sexual assault claims, the

25 failure to intervene claims against Elmore.

1              Mr. Girard, do you want to take a shot at amending the

2    due process claim against Gutwein?

3              MR. GIRARD:  Huh?

4              THE COURT:  Mr. Girard?

5              MR. GIRARD:  Hello?

6              THE COURT:  Yes.  Do you want the opportunity to try

7    to amend the due process claim against Gutwein?

8              MR. GIRARD:  I just wanted to -- yes, like make

9    sanctions.

10             THE COURT:  Well, as I just explained, you -- one of

11   your claims against Gutwein is that he wouldn't let you get some

12   audio and video footage and wouldn't let you call witnesses.  I

13   dismissed that claim because you don't say what was important

14   about any of that evidence, but I am giving you the opportunity

15   to amend the complaint if you can explain to me why that

16   evidence would have made a difference in the hearing, and why it

17   wasn't cumulative, and why it was relevant.

18             MR. GIRARD:  Right.

19             THE COURT:  So if you want to opportunity, I will give

20   you that opportunity.

21             MR. GIRARD:  Yes, I do.  I would like that.

22             THE COURT:  Okay.  So --

23             (Cross-talk)

24             MR. GIRARD:  Would I have to include like the fact

25   that he had them on the witness list but never called them,

1  something like that?

2          THE COURT:  No.  It doesn't matter who is on the list.

3  If you asked him to call somebody --

4          MR. GIRARD:  Right.

5          THE COURT:  -- and he didn't call that person, you've

6  got to show a few things:  One, you've got to show that their

7  testimony would have been relevant.  You've got to show why it

8  would have been important, and you've got to show what

9  difference it would have made.  So if there is 15 people on the

10 exhibit list, just to use an unrelated example, let's say there

11 is a car crash, and ten people saw it.

12         MR. GIRARD:  Right.

13         THE COURT:  But three or four of them testified, and

14 they all say the light was red, and the blue car went through

15 it.  You don't need to call the remaining six to say the same

16 thing.

17         MR. GIRARD:  All right.

18         THE COURT:  It's duplicative.  Or let's say the

19 remaining six were all there, but they were looking the other

20 direction; they didn't see anything.  They are not relevant.

21 They don't have anything to contribute.

22         MR. GIRARD:  Right.  So --

23         THE COURT:  So in this case if your argument is that

24 your due process rights were violated because you weren't

25 allowed to use that footage or those witnesses, you've got to

1  tell me what was in that footage, what those witnesses would

2  have said, why it was relevant, why it wasn't duplicative, and

3  why it would have made a difference.

4          MR. GIRARD:  Oh, okay.

5          THE COURT:  All right.  And so you are going to file a

6  third amended complaint.  No, a second amended complaint.  And

7  it should include everything you want me to consider with

8  respect to the due process claim, and don't repeat what's in the

9  other complaints with respect to the claims I have dismissed.

10 So you can't change anything with respect to the excessive

11 force, sexual assault, or failure to intervene with respect to

12 Elmore.

13          So the only claims that should be in the amended

14 complaint are the due process claim versus Gutwein, and that you

15 are allowed to beef up; and then with respect to the other

16 claims that survive, the excessive force claim, the sexual

17 assault claim, and Elmore failing to intervene, those should be

18 the same.

19          MR. GIRARD:  Okay.

20          THE COURT:  I mean, I guess you can add things if you

21 want, but you can't add new defendants or new claims.

22          MR. GIRARD:  No.

23          THE COURT:  The only new defendants -- no, you can't

24 add new defendants and new claims at all.  The only thing, you

25 can beef up the facts on the claims that have survived, and you

1  can try to add facts that would make that due process claim

2  viable, but no new claims or defendants.

3          How long would you need to do that, to file that

4  second amended complaint?

5          MR. GIRARD:  Probably -- what if -- I am not going

6  to -- so it says here because today I was supposed to go on a

7  medical trip, and it seems like every time they schedule my

8  medical trips, I have court.  So it's like I don't get to go to

9  my medical trips.  And it's hard for me to get in the law

10 library also, to have access.  It's like they are not letting me

11 in there unless you have like a deadline.

12         THE COURT:  Well, how long would you like?

13         MR. GIRARD:  I would like two -- two months or even a

14 month.  Wait.  Today is --

15         THE COURT:  Well, you'll really just -- you're just

16 beefing up the one claim regarding the excluded evidence, and

17 you got to tell me who the excluded witnesses were, what was on

18 the excluded video, and why that would have made a difference at

19 the hearing.  You know, I don't think you really need to spend a

20 lot of time in the library for that.  I will give you six

21 weeks --

22         MR. GIRARD:  Six weeks.

23         THE COURT:  -- which should be plenty.

24         MR. GIRARD:  I just want to ask about the transcripts

25 from the conference.  How do I speak to -- what's her name?

```
 1  Ms. Angie Shaw-Crockett and --

 2            THE COURT:  The court reporter?

 3            MR. GIRARD:  Right.  I wasn't able to obtain them for

 4  4/23/21.

 5            THE COURT:  Well, did you send her the money?

 6            MR. GIRARD:  I didn't get any reply back.  I didn't

 7  receive any.

 8            THE COURT:  Didn't my courtroom deputy send you the

 9  form?  Hold on a second.  Did you get the transcript request

10  form?

11            MR. GIRARD:  No.

12            THE COURT:  Oh.

13            MR. GIRARD:  I just got a paper saying to write her

14  and obtain them from her.

15            THE COURT:  Yes.

16            MR. GIRARD:  That was it.

17            THE COURT:  Back in August I directed the clerk to

18  send you a transcript request form, and if that didn't get done,

19  I will make sure it gets done now.

20            MR. GIRARD:  Thank you.

21            THE COURT:  You have to fill it out, and it explains

22  what you need to do, but it costs money.

23            MR. GIRARD:  Okay.

24            THE COURT:  All right.  So I will give you until

25  March 15th for the amended complaint.
```

```
 1              MR. GIRARD:  Okay.

 2              THE COURT:  Ms. Zaffrann, the customary 21 days to

 3  answer?

 4              MS. ZAFFRANN:  Your Honor, will I have the

 5  opportunity, if the complaint is amended to include new

 6  allegations about due process claims, to file a motion to

 7  dismiss if appropriate?

 8              THE COURT:  Yes.  I mean, if you think that the new

 9  complaint still fails to state a claim, you can move to dismiss

10  it.  So April 5th, would that be enough time?  You would only

11  have the one claim to be dealing with.

12              MR. GIRARD:  All right.  Yes.

13              THE COURT:  No.  I am asking Ms. Zaffrann --

14              MR. GIRARD:  Oh.

15              THE COURT:  -- if three weeks to either answer or move

16  to dismiss the due process claim would be enough for her.

17              MS. ZAFFRANN:  If it's acceptable to Your Honor, if I

18  could have 30 days to April 15th?

19              THE COURT:  All right.  All right.  April 15th.  So

20  you will either answer or move to dismiss the due process claim.

21              If a motion to dismiss is made just as to the due

22  process claim, why don't we say Mr. Girard will respond -- this

23  is going to be a much more limited issue because it's just the

24  one claim, and we have already discussed what the legal

25  principles are.  So let's say May 16th for opposition, and
```

```
 1  May 30th -- let me make sure that's not Memorial Day.  That may
 2  be Memorial Day.  Yes, it is.  May 31st for a reply, and I will
 3  give you a ruling from the bench on that.  It's not going to be
 4  a tough one if it's made.  Let me just check the calendar.
 5          MS. ZAFFRANN:  Your Honor, if I may?
 6          THE COURT:  Yes.
 7          MS. ZAFFRANN:  So I have a trial in state court the
 8  24th to the 26th.  Is there -- could I extend my response date
 9  to June 3rd?
10          THE COURT:  Yes.  June 3rd, 2022, and I will give the
11  parties a bench ruling on June 30th at 9:30.  If instead of
12  moving to dismiss, the defendants' answer, we will have a
13  conference to set a discovery schedule.
14          And, you know, if, Mr. Girard, you decide you don't
15  really have enough to show that those witnesses were important,
16  and you want to drop that claim, you know, that might get your
17  case moving faster because if you proceed on it, and they move
18  to dismiss again, you know, that's going to hold things up for a
19  little while, but that's up to you.  Now that you know the lay
20  of the land, you can decide what you want to do.
21          MR. GIRARD:  Okay.
22          THE COURT:  So let me give you those dates again.  The
23  second amended complaint by March 15th.  Not adding new claims
24  or defendants, just beefing up the due process claims against
25  Gutwein, and restating the excessive force, sexual assault, and
```

1  Elmore failure-to-intervene claims.  Then by April 15th, the

2  attorney general will either answer, in which case we will have

3  a conference and set a discovery schedule, or they will move to

4  dismiss the due process claim again, and your opposition will be

5  due May 16th, and their reply June 3rd, and I will give you a

6  ruling on June 30th.

7           MR. GIRARD:  Okay.

8           MS. ZAFFRANN:  Your Honor?

9           THE COURT:  And set the discovery schedule thereafter.

10          Yes, Ms. Zaffrann?

11          MS. ZAFFRANN:  Just two points of clarification:  The

12  amendment is only for the due process claim relating to the

13  excluded audio/video and witnesses; is that correct?

14          THE COURT:  Yes.

15          MS. ZAFFRANN:  And the -- should the attorney

16  general's office answer, then on April 15th, is that when the

17  discovery conference would be or would that be set later?

18          THE COURT:  No.  That's the day your answer would be

19  due, and then I will set a date for a conference.

20          MS. ZAFFRANN:  Okay.  Thank you.

21          THE COURT:  Once the answer comes in, that will

22  trigger a notification of a conference.  All right.

23          If there is nothing else, I will ring off.

24  Everybody --

25          MS. ZAFFRANN:  I am sorry, Your Honor.  May I have

1  just one more clarification?  So if the attorney general's

2  office moves to dismiss, that limited move to dismiss against

3  Gutwein on April 15th, should we also put in there a request to

4  adjourn the answer date for the other defendants until the

5  resolution of the motion to dismiss?

6           THE COURT:  I will grant that right now.  If a motion

7  to dismiss is made April 15th, all defendants' time to answer

8  will be extended to a date I will set after I rule on the motion

9  to dismiss.

10          MS. ZAFFRANN:  Thank you, Your Honor.

11          THE COURT:  All right.  Thank you, all.  Everybody

12  stay well.  Bye-bye.

13          (Time noted:  12:23 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25