STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

DIVISION OF REGIONAL OFFICES
WESTCHESTER REGIONAL OFFICE

August 9, 2023                    (914) 422-8845

The Honorable Cathy Seibel
Charles L. Brieant, Jr. Federal Building and U.S. Courthouse
300 Quarropas Street
White Plains NY 10601

*These discovery issues will be discussed at the in-person conference on 08/21/2023 at 11:30 a.m.*

SO ORDERED.                    8/16/23

*Cathy Seibel*
CATHY SEIBEL, U.S.D.J.

            Re:    Girard v. Gutwein
                   20 CV 5883

Dear Judge Seibel:

I write in response to Plaintiff's letter dated August 7, 2023, which requested a stay of the discovery deadline to address what Plaintiff's asserts are outstanding discovery issues. I believe that Defendants have fully responded to Plaintiff's discovery and furthermore, some of the issues raised by Plaintiff were already resolved in a prior discovery conference with the Court.

1) **Disciplinary Hearing Tapes**: After motion practice, the Court allowed Plaintiff to proceed with a sole Due Process violation based on Defendant Gutwein denying Plaintiff's request at the disciplinary hearing for video of two areas in the facility (SHU and the Mental Health Unit), which Plaintiff argued would show the extent of his injuries. Defendants' initial Rule 26 disclosures – which was provided to Plaintiff almost a year ago on August 11, 2022 – included a copy of the disciplinary hearing transcripts. Despite having the hearing transcripts for almost a year, Plaintiff now claims that the transcripts contains omissions. Plaintiff submitted a discovery request seeking the audio tapes of that hearing and Defendant has responded that the tapes no longer exist. Thus, Defendant has not refused to provide responsive documents – the tapes no longer exist. Plaintiff then demands that Defendants provided an affidavit detailing the destruction of the tapes. Plaintiff, however, has failed to provide any information as to how the hearing tape transcripts are deficient as to the lone Due Process issue in this case, and has failed to explain how such an affidavit would be relevant to resolving Plaintiff's claim.

2) **Interrogatories**: Initially, Plaintiff alleges that Defendants failed to adequately respond to Interrogatory 3, which demanded the identity of the medical staff who provided treatment to plaintiff after the incident. Defendants responded to this Interrogatory with a demand for a HIPPA release. On June 9, 2023, Defendants

provided Plaintiff with a complete copy of his medical records, in response to this Interrogatory. Defendants approach was consistent with the Court's directives (See , Dkt. # 105 (Transcript of Court Conference on May 19, 2023, p. 29 – 30,attaqchedhereto as Exhibit A, discussing that records would be sufficient as responses to the Interrogatories). Plaintiff now claims that he cannot verify the identity of the medical providers from the documentation contained in his own medical records and asserts that Defendants – who were all security staff at Green Haven Correctional Facility – somehow have knowledge of the identity of Plaintiff's medical providers. None of the Defendant, however, were involved with providing medical care to Plaintiff or have independent knowledge regarding any treatment he received. Accordingly, none of the Defendants would be able to provide any information regarding medical treatment, apart from what is contained in the medical records.

Plaintiff also seeks further information from Defendant Blot in response to Interrogatory Five regarding any civil matters in which Defendant Blot testified. Foremost, at the prior discovery conference, the Court ruled that this Interrogatory was overbroad, and further ruled As noted by Plaintiff, Defendant Blot was subject to a deposition where he acknowledged that he may have provided a previous deposition in another civil case. Defendant's Blot deposition contains all of the information that he could recall regarding other civil litigation – his response this Interrogatory would be no different than his deposition responses. Therefore, to the extent an Interrogatory amendment is needed, Defendants refer Plaintiff to Defendant Blot's deposition transcript..

Last, Plaintiff demands that each defendant verify the interrogatories. Foremost, each of the Defendants have provided a sworn deposition in this case, wherein Plaintiff's counsel inquired about the allegations contained in the Complaint and all other relevant areas regarding this case. Thus, Plaintiff already has already obtained sworn statements from each Defendant regarding the various topics in the Interrogatories. The Court has already ruled that providing additional responses to the Interrogatories would be "busy work" where the referenced documents contain the requested information. (Ex. A, p. 29 – 30.) On the eve of discovery closing, demanding information duplicative to the sworn statement contained in the depositions seems simply like busy work, that provides no additional information to Plaintiff.

Very truly yours,

*Rachel Zaffrann*

Rachel Zaffrann
Deputy Assistant Attorney General

# Exhibit A

## Discovery Conference Transcript

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
CHAUNCEY T. GIRARD,

                          Plaintiff,

                                    20 CV 5883(CS)
      -vs-
                          DISCOVERY CONFERENCE

COMMISSIONER ERIC GUTWEIN, et al.,

                          Defendants.

------------------------------------x

                                    United States Courthouse
                                    White Plains, New York

                                    May 19, 2023

Before:  THE HONORABLE CATHY SEIBEL, District Judge

A P P E A R A N C E S:

RICKNER PLLC
      Attorneys for Plaintiff
      14 Wall Street
      Suite 1603
      New York, New York 10005
BY:  STEPHANIE PANOUSIERIS

NEW YORK ATTORNEY GENERAL'S OFFICE
      Attorneys for Defendants
      44 South Broadway
      Fifth Floor
      White Plains, New York 10601
BY:  RACHEL C. ZAFFRANN

1          THE DEPUTY CLERK:  The Honorable Cathy Seibel

2   presiding.  Girard v. Gutwein.

3          THE COURT:  Good morning, Ms. Panousieris?

4          MS. PANOUSIERIS:  Perfect.  Thank you, Your Honor.

5          THE COURT:  I had a little pronunciation help from

6   Mr. Clark.  And, Ms. Zaffrann.  You can both have a seat.

7          MS. ZAFFRANN:  Good morning, Your Honor.

8          THE COURT:  All right.  We have discovery issues.

9          MS. PANOUSIERIS:  Yes, Your Honor.

10          THE COURT:  Let's go through them in order.  First is

11   document request number eight:  All grievances, PREA reports,

12   311 calls, or other reports or complaints made by any inmate

13   against any individual defendant for five years prior to the

14   incident regarding excessive force.

15          Is it still your position that there aren't any?

16          MS. ZAFFRANN:  Your Honor, I did present these

17   requests to the agency and to Green Haven, and that is the

18   response I got.  I can, if Your Honor would like, inquire again

19   of the agency, but --

20          THE COURT:  I will tell you my concern.  I know the

21   name "Michael Blot" because he gets sued a lot, and if you go to

22   Westlaw, and you put in his name -- now maybe there's two

23   because I know sometimes fathers and sons become COs -- but if

24   you put in Michael Blot, he's been sued five or six times for

25   excessive force.  So anybody who told you that there weren't any

1   didn't do his or her job.  And to be honest, if either lawyer in

2   this room knew that, neither of you did your jobs, either.  I

3   didn't bother doing the same exercise for Gutwein, Polito,

4   Elmore, the other defendants, but I knew the name Michael Blot

5   because it's an unusual name.  Now as I said, maybe the Michael

6   Blot who gets sued isn't the same Michael Blot who is the

7   defendant in this case, but maybe he is.  So it seems like there

8   is a good-faith basis to conclude that you can't take DOCCS's

9   word.

10          You said, Ms. Panousieris, that plaintiff had a good-

11  faith belief that records existed.  What was that good-faith

12  belief based on?

13          MS. PANOUSIERIS:  Your Honor, it was the same instance

14  that you just stated; that I was able to find, at minimum,

15  Michael Blot's name on Westlaw, and also just from my experience

16  litigating these cases, it's ordinarily rare that no allegations

17  of force exist against even one officer, let alone a whole host

18  of officers, and so that is why I inquired as to what steps were

19  taken to search for these documents because I just wanted to be

20  clear it was not a blanket representation by one DOCCS

21  individual and no search hadn't actually taken place.

22          THE COURT:  So, obviously, somebody didn't undertake

23  an appropriate search unless, of course, there's two Michael

24  Blots.  But yeah, it would be pretty stunning if none of these

25  defendants had ever been accused of anything.

1          Now, it may be that the only central place where this
2  information would be found -- I shouldn't say central.  It may
3  be that the only place where this information would be found
4  would be the officer's disciplinary files or the legal
5  department.  I don't know where one would search to get this
6  information, but it sure seems like somebody didn't do
7  somebody's job.
8          Frankly, Ms. Zaffrann, you have been doing this work,
9  too.  I would think you would understand how rare it would be
10 that there is not a single complaint.
11         So two things:  The AG is to go back to DOCCS and tell
12 them to do it right, and the custodian of records shall
13 accompany the results with an affidavit describing where such
14 records might be found, what was done to look for them,
15 describing all the places where such records might be found,
16 what was done to look for them, and what the results were.  And
17 that's to be done in 30 days, which is a Saturday.  No, that's a
18 Sunday, and the Monday is the Juneteenth holiday, so that's to
19 be done by June 20th.  And I'm sure somebody at DOCCS will whine
20 about having to do that, but they invited it by their first
21 response.
22         And if you are not satisfied, Ms. Panousieris, you can
23 depose that person.
24         Request number nine for the disciplinary files -- oh,
25 and, by the way, before we leave number eight regarding

1   excessive force, the -- that would only be as to the defendants

2   other than Gutwein.

3          MS. ZAFFRANN:  Your Honor, if I may, Sergeant Elmore

4   was not excessive force.  It was failure to intervene, so would

5   that only be for Polito, Rios, and Blot?

6          THE COURT:  Polito, Rios, and Blot.

7          MS. PANOUSIERIS:  Your Honor, if I may, I would ask

8   that we go ahead and get those records for Sergeant Elmore

9   despite the fact that he is not accused of directly assaulting

10  my client in this particular instance.  I believe that prior

11  instances of his own use of force would be relevant to the

12  accusation that he failed to intervene and failed to report the

13  misconduct.  If he, himself has engaged in similar conduct, it

14  goes to -- you know, the inference is that he may have aided in

15  these officers in covering up this use of force.

16         MS. ZAFFRANN:  Your Honor, if I may, that would be

17  impermissible evidence, character evidence.

18         THE COURT:  Well, I'm going to order you to turn it

19  over, and we will see what it is, and then we will decide before

20  trial if it's allowed under 404(b) or not.

21         MS. PANOUSIERIS:  Thank you, Your Honor.

22         THE COURT:  I think it has some relevance.

23         Request number nine, disciplinary files, I think that

24  is overbroad.  It should be limited to allegations relating to

25  similar conduct or to credibility.

1          MS. PANOUSIERIS:  Your Honor, if we may clarify

2   similar conduct because I believe it's the State's position that

3   it's only excessive force we would be looking into, but as Your

4   Honor knows, there is also, as you said, issues of veracity,

5   PREA allegations, due process violations, and failure to

6   intervene.  So I do think it's a bit broader than the State is

7   making it out to be, but I'm happy to narrow it to those

8   categories.

9          THE COURT:  Yes.  It did seem, Ms. Zaffrann, that you

10  had overlooked that there does remain a due process claim

11  against Gutwein relating to the video evidence.  So as to

12  Gutwein, it would be -- I would be surprised if there was this,

13  but maybe there is -- relating to exclusion of exhibits at the

14  hearing.  For the others, it would be excessive force or failure

15  to intervene, and for Polito, sexual misconduct and harm.

16         MS. ZAFFRANN:  Your Honor, the failure to intervene,

17  does that only go to Sergeant Elmore?

18         THE COURT:  No.  It goes to all of them because -- for

19  the reasons Ms. Panousieris articulated.

20         Number ten, you're going to -- and number 11, has that

21  been turned over?

22         MS. PANOUSIERIS:  No, Your Honor.

23         MS. ZAFFRANN:  No, Your Honor.  I do not -- I do not

24  have the medical records from DOCCS yet.  I do have the mental

25  health file.  I was going to turn it over when I received all of

1  the records, both mental health and medical.

2          THE COURT:  Have you gotten the stipulation, the HIPAA

3  authorization?

4          MS. ZAFFRANN:  Yes, Your Honor.  I have the

5  authorization.

6          THE COURT:  So I want you to turn over the mental

7  health now, and turn over the medical by June 20th or else -- I

8  don't know how to sanction DOCCS -- or else whoever in charge

9  of getting that information to the AG will have to come here in

10 person and explain why it wasn't done.  I don't want to start

11 sanctioning money for people, and, you know, I understand they

12 are shorthanded, but if their officers are going to keep getting

13 sued all the time, they are going to have to put the resources

14 into defending them.

15         MS. ZAFFRANN:  I appreciate that, Your Honor.  And, of

16 course, I'm going to convey your sentiment to DOCCS very

17 strongly, but I would note that the HIPAA authorizations were

18 not received by my office until the very end of February.  So

19 it's --

20         THE COURT:  All right.  So it shouldn't take three

21 months to put together a medical file.  I mean, I don't know how

22 they are kept, but Bureau of Prisons it's two clicks, and the

23 medical file is produced.  So I am guessing DOCCS is still in

24 Dark Ages, but, you know, we are already almost three months out

25 from when the authorization was done.

1          Yeah, so I understand it's not your office's doing,

2   but like I said, if they are going to have -- if they are not

3   going to put enough resources into defending these cases, it's

4   going to hurt their own employees, even the ones who haven't

5   done anything wrong.

6          All right.  Number 12, I'm confused what the problem

7   is here.

8          MS. ZAFFRANN:  If I, may Your Honor?  So Number 12

9   requests for the log-ins identifying DOCCS staff, which in my

10  response I said that if it was limited to that, that's okay, and

11  then incarcerated individuals.  And pursuant to state law, DOCCS

12  and other agencies are prohibited from releasing information

13  like that.  So in that response I would provide --

14         THE COURT:  The law says you can't disclose personal

15  information pertaining to the incarceration of an inmate which

16  is evaluative in nature or which could endanger the person.

17         MS. PANOUSIERIS:  Your Honor, I would just point the

18  Court to Subsection K, which allows for such disclosure in a

19  judicial proceeding, compulsory legal process, and of course we

20  are in federal court, and while we respect state law here, it

21  does not control their discovery obligations, and the state -- a

22  state law privacy exemption does not apply here, and even if it

23  did, we have Subsection K, which allows this Court to order the

24  disclosure of such records.

25         THE COURT:  And this -- you want this because your

1   client says there are other inmates that saw what happened?

2           MS. PANOUSIERIS:  Exactly, Your Honor.

3           THE COURT:  And he doesn't know who they are?

4           MS. PANOUSIERIS:  Some of them have been identified,

5   and those records have been produced to the State, but he

6   believes that there were multiple other people that potentially

7   saw what happened, and I would at least like to inquire with

8   these individuals, but I can't do so without knowing who was

9   there.

10          MS. ZAFFRANN:  If I may briefly, Your Honor?

11          THE COURT:  Yes.

12          MS. ZAFFRANN:  So if Your Honor does elect to compel

13  DOCCS to provide that information, which I agree that by court

14  order DOCCS can provide that information.  I would just ask that

15  the information remain confidential to this particular case

16  because the individuals who are nonparties who do have privacy

17  interests, they were in a special housing unit, probably for

18  disciplinary proceedings, and that is a privacy interest that I

19  think shouldn't go onto a public docket.

20          MS. PANOUSIERIS:  I agree, Your Honor.

21          THE COURT:  I think that's fair.  So why don't you two

22  confer on an order that I can sign ordering the disclosure, but

23  providing that it's to be kept confidential and used only for

24  this case.

25          All right.  Number 15, I don't understand the debate

1  here, either.  As I understand it, the request is for the full

2  calculation of good-time credits, and the State only wants to

3  give you the records showing the effect that the discipline at

4  issue here had?  Isn't it all the same file?

5          MS. ZAFFRANN:  Your Honor, with respect -- first off,

6  there's good-time credits and earned eligibility.  The good-time

7  credits can be affected by subsequent disciplinary actions or

8  other things that have happened since this particular incident.

9          With respect to the earned eligibility, that is much

10 greater than just good-time credits.  That includes certain type

11 of conduct that the incarcerated person may have engaged in at

12 the facility that is positive, for example, getting a GED or

13 going to certain types of -- like completing an anger management

14 course, things such as that; and likewise, the earned

15 eligibility is something that goes -- it's different than

16 good-time credit.

17         THE COURT:  So what's your objection to turning over

18 the requested information?

19         MS. ZAFFRANN:  So my objection is that it would be

20 overbroad.  It would be if it were limited to the -- how this

21 particular disciplinary sanction impacted good-time credits,

22 that would be okay, but there could be other things that were

23 impacting good-time credit outside this particular proceeding.

24         THE COURT:  Why is the inmate not allowed to know

25 that?  Isn't that something that his counselor would go over

1    with him anyway or whatever the proper term is?

2         MS. ZAFFRANN:  I think that I can inquire of DOCCS,

3    but my understanding is that this is something that is

4    calculated on a regular basis.  It's kind of a moving target

5    because, again, it's based on what's happening in the moment and

6    what has been happening with respect to the incarcerated person

7    and their sentence.

8         THE COURT:  So I guess I'm wondering if at least as to

9    the earned --

10        MS. PANOUSIERIS:  Eligibility.

11        THE COURT:  -- eligibility credits, conduct occurring

12   later can affect what happens.

13        How is the plaintiff supposed to figure out the effect

14   of this incident if the whole file isn't turned over?

15        MS. ZAFFRANN:  Well, Your Honor, I think the request

16   can be made to say -- narrowed, how did the disciplinary

17   sanctions imposed in this case affect the good-time credits

18   and/or the earned eligibility?

19        MS. PANOUSIERIS:  Your Honor, with respect to that

20   particular narrowing, I would object.  I think that's more along

21   the lines of an interrogatory, and Your Honor may have already

22   looked at the State's responses to the interrogatories, but they

23   are not responded to in full, and I would also need to rely upon

24   the State's representation as to the effect rather than do the

25   calculation myself.

1      THE COURT:  I'm not understanding the reluctance.  I

2  mean, is there some -- is this just, you know, because it's

3  lawyers' instincts to narrow things or is there something that

4  you're worried about in the rest of the document?

5      MS. ZAFFRANN:  I'm not sure why information related --

6  unrelated to this action and -- but related to the good-time

7  credit calculation should be brought into this action because

8  the only question here is how it impacted.

9      THE COURT:  Well, I agree with you, but I am asking a

10  different question, which is:  What's the concern?  Like, is

11  this private information that the prisoner is not allowed to

12  see?  Because it seems like it's something he would be entitled

13  to anyway.

14      MS. ZAFFRANN:  Well, Your Honor, he -- I don't know

15  the answer to when DOCCS provides that type of information.  I

16  know that they do provide like conditional release dates.  They

17  do proved maximum expiration dates, parole hearing dates; that

18  information is something that is available, and my concern is

19  what -- what the information outside of this litigation would be

20  used for.  Would it be used for another litigation?  Would it be

21  used to say the good-time credits were not calculated properly

22  because of something that happened in 2020?

23      THE COURT:  Well, why don't we just make it subject to

24  the same order; that it's to be used only for this case?

25  Because it seems to me, the plaintiff doesn't have to rely on

1  DOCCS's evaluation of what the effect of this discipline was,

2  and it seems like it could have effects down the line that are

3  indirect.  I mean -- I'm making this up -- but I could see, you

4  know, two years after a discipline, you know, you're deciding

5  whether to give somebody credit for some positive thing, and you

6  take into account, well, they had a recent discipline, you know.

7  I think it should be turned over subject to the same provision

8  that it's to be used only for this case.

9         And don't make me regret it by -- Ms. Panousieris, by

10 trying to bring into this case whether the calculation was

11 right.

12        MS. PANOUSIERIS:  Yes, Your Honor.

13        THE COURT:  All right.

14        MS. ZAFFRANN:  Your Honor, may I ask, what is the end

15 date for that since the request just says any time after the

16 incident, so as this is a rolling calculation, what would the

17 end date be?

18        THE COURT:  As of the day you turn it over.  So number

19 16 I think should be limited to procedures in place before the

20 incident.  What's the relevance of procedures in place after the

21 incident?

22        MS. PANOUSIERIS:  Your Honor, we typically just ask

23 for the year before and the year after to see -- we come to this

24 issue in depositions where the officers are referring to an

25 older rule or a newer rule, and it helps orient me to the

1  correct rule they should have been abiding by at the instant

2  date, and so it's kind of to use through the deposition process

3  to orient the officer as well and use as an exhibit if

4  necessary.  I can't imagine that the year before and the year

5  after would actually be used at trial for any purpose.  It's

6  just a discovery tool to assist with the deposition process.

7          THE COURT:  Well, I think it should be limited to

8  presenting evidence because I've dismissed the calling witnesses

9  part.

10          MS. PANOUSIERIS:  Yes, Your Honor.  We have no

11  objection to that.

12          THE COURT:  I don't see how it's burdensome.  So let's

13  limit it to presenting evidence, and then otherwise that should

14  be turned over.

15          Preservation of evidence.  I understand if the -- if

16  there is video of the incident that wasn't preserved, that's of

17  concern to the plaintiff, but what relevance does it have to the

18  claims against the individual defendants?

19          MS. PANOUSIERIS:  Well, Your Honor, we believe that in

20  this particular instance that defendant Gutwein, while he had

21  custody and control over this video, he was the one who

22  allegedly looked at it, decided it was not relevant, and then

23  chose not to do anything with it afterward; and given the number

24  of complaints that my client was filing with various officers

25  and through the grievance procedure, we believe there is a

1  good-faith basis to at least inquire into what steps were taken

2  to preserve this, if at all.  It's very possible that after this

3  information was disclosed to us, we see that there was no direct

4  reason that Gutwein or any other defendant here had a reason to

5  preserve the video, but without -- again, without inquiring into

6  it, we have no way to know.  So we just would like to look into

7  that given that the video is a very central part of my client's

8  claims.

9          THE COURT:  So the -- go ahead, Ms. Zaffrann.

10          MS. ZAFFRANN:  Yes.  And Your Honor, we have turned

11  over the hearing tapes, and when you look at the transcripts of

12  the tape, I don't see where it says Mr. Gutwein looked at the

13  videos.  What he said was that the location of the videos was

14  not where this incident occurred, and if we -- as you look at --

15  so I'm not sure how saying Mr. Gutwein had the videos

16  themselves, I don't think that's accurate, and I don't think the

17  hearing transcript reflects that.

18          MS. PANOUSIERIS:  If it's the State's position that

19  defendant Gutwein didn't even look at the videos for the

20  relevance, I will take that admission; but my understanding was

21  that he actually looked at them and then decided that they were

22  not relevant.  My client's deposition testimony just a couple of

23  weeks ago made clear why he asked for the certain videos that he

24  did, and what happened in each location that may have been seen,

25  including the SHU elevator, where my client actually during his

1   deposition testified that he lost consciousness and did not know

2   what, if anything, the officers did to him while he was in the

3   elevator.  But he did have these injuries after this incident,

4   and he told the hearing officer and told his assistant at the

5   disciplinary hearing that this was the reason he wanted this

6   video.

7            THE COURT:  So --

8            MS. ZAFFRANN:  Actually, Your Honor --

9            THE COURT:  What Gutwein said is the use of force

10  occurred in Location A, and these cameras are in Locations B and

11  C, so I don't need to look at them?  Is that an over-

12  simplification, but a fair one?

13           MS. ZAFFRANN:  It's -- I mean, I don't believe he did

14  look at -- looked at the video based on the hearing and based on

15  the hearing transcript, and I think that the videos are a little

16  bit of a red herring because even in the hearing transcript the

17  incarcerated individual, the plaintiff says -- admits these were

18  not where the use of force occurred.  He wanted them to show his

19  alleged injuries, and the disciplinary hearing was whether or

20  not the incarcerated individual assaulted a correction officer;

21  and there is no allegation that that occurred in SHU or in the

22  mental health unit, which is the only two places where the

23  videos were.

24           So if the disciplinary hearing was had about the mis-

25  conduct of -- the alleged misconduct of the correction officers,

1 that would be a completely separate process.  This was a

2 disciplinary hearing -- disciplinary hearing for whether or not

3 plaintiff committed any violations.

4          MS. PANOUSIERIS:  Well, of course, Your Honor, if

5 plaintiff's defense in his disciplinary hearing was that he was

6 not an aggressor and was actually attacked, it's extremely

7 relevant to the disciplinary hearing.

8          THE COURT:  Was that his defense?

9          MS. PANOUSIERIS:  Yes.  Absolutely.  He brought up

10 this assault during his disciplinary hearing.  He made clear why

11 he wanted these videos, and Ms. Zaffrann is referring to a part

12 of the hearing transcript where he has described -- where my

13 client is describing that he felt the elevator video, in

14 particular, would have a good view of his injuries, and we

15 learned in his deposition that the reason for this is that he

16 lost consciousness and believes he was on the ground in the

17 elevator, which is extremely probative of an assault on him

18 rather than him being the aggressor on the officers.

19          THE COURT:  Right, but that doesn't mean Gutwein at

20 the hearing would have known that that's what your client was

21 thinking.

22          Look, here is what I think should happen:  There's one

23 of two ways to do this, and I think one is way more efficient

24 than the other.  One is, turn it over now.  You will depose

25 Gutwein.  If it turns out he never had them, and therefore the

1  policy is irrelevant, so be it; but if you don't turn them over,

2  and then you depose Gutwein, and it turns out he did have them,

3  and the policy is relevant, then you have to depose him again.

4  So I think you should just turn it over.

5          And if you are correct that Gutwein, you know, never

6  had the videos, I guess the policy could still be relevant in

7  some way.  Your argument would be they didn't preserve them

8  because they knew it showed something bad?

9          MS. PANOUSIERIS:  Exactly, Your Honor.  And I also --

10 I have not been able to follow up with Ms. Zaffrann yet, but her

11 last disclosure was the maintenance records for the various

12 surveillance cameras, and there's a few notations on there that

13 indicate to me there's a possibility some of these cameras -- I

14 would need to someone to explain the documents to me first --

15 but it looks like some of these cameras may or may not have been

16 operating that day, and I also think that's relevant.  If the

17 officers knew that they weren't operating or somehow interfered

18 with the video, of course, those are things we want to look

19 into, and understanding what the preservation policies are, just

20 the bedrock foundation of those questions.

21          THE COURT:  Well, you are getting Number 18.

22          MS. PANOUSIERIS:  Thank you.

23          THE COURT:  Let's go to Number 20.  Training materials

24 concerning rights of inmates who are being disciplined to call

25 witnesses and present evidence.  It seems to me that would be

1  relevant only to Gutwein and only to presenting evidence.

2          MS. PANOUSIERIS:  Yes, Your Honor.  There is no

3  objection to that.

4          MS. ZAFFRANN:  Your Honor, what would be the date

5  limit on that?

6          THE COURT:  As of the events -- in other words,

7  whatever training he got up to the time of the hearing in this

8  case.  I don't expect him to have been clairvoyant about future

9  training.

10          Number 22 --

11          MS. PANOUSIERIS:  Your Honor, I would ask that this

12  particular -- these training materials related to preservation,

13  although I understand that Gutwein may have been the only person

14  who actually had custody and control over the videos themselves,

15  I am also interested, as I have brought up in these new

16  disclosures that talk about which cameras were and weren't

17  working, and there is also a notation on them that says that

18  there is some sort of interference.  Again, I don't know what it

19  means because it's not a document I've seen before, but I am

20  interested in the training that any of these officers would have

21  received because, for example, if DOCCS says, you are involved

22  in the use of force, you need to put in some sort of

23  preservation notice, something, I just want to know that.  It's

24  highly likely that doesn't exist.  I just want to know if it

25  does.

1          MS. ZAFFRANN:  Your Honor, it seems some of those

2   questions could be resolved simply at the depositions, which we

3   do have scheduled in mid June, and I am not quite understanding,

4   and it's the first time I'm hearing that somehow these

5   correction officers had access to security cameras, and that's

6   because the maintenance is done by a third party.  It's not even

7   done by DOCCS.

8          THE COURT:  Well, I don't think anybody expects the

9   COs to -- the ones on the ground to be maintaining the videos,

10  the cameras and all that.  And some of the cameras -- I don't

11  know about DOCCS -- but I know I have been in facilities where

12  some of the cameras are dummies that never work because there is

13  good reasons to make people think they work.  I don't expect the

14  COs to have information about that because part of the reason

15  for the cameras is to watch them and the inmates.

16          But if there were a policy that said, any time you use

17  force, you should notify sergeant so-and-so to preserve the

18  video, and they didn't do that, that would be relevant.  As

19  Ms. Panousieris said, pretty sure there is no such policy.  It

20  would make everybody's life easier if there were, and now that

21  I'm thinking about it, this seems like it would be a good thing

22  for your office to try to convince DOCCS of because if there

23  were such a policy, your job would be a lot easier because

24  oftentimes these videos show that the inmate is full of it.  And

25  instead, the video becomes a plus for the inmate who not only

 1   does it not show that the inmate is full of it, but it makes it

 2   seem a little sleazy that the officers don't have it, and -- I

 3   don't know.  If I were advising them, I would tell them they

 4   should make such a rule, but I'm pretty sure this is just a

 5   phone call on your part, and they are going to say there is no

 6   such rule.  So --

 7            MS. ZAFFRANN:  So and, Your Honor, just to be clear,

 8   the videos are at two different locations.  This incident -- the

 9   alleged initial incident occurred at the housing unit, and these

10   videos are in a completely different part of the facility, just

11   to be clear.

12            THE COURT:  Well --

13            MS. ZAFFRANN:  Which I have provided that information

14   to counselor.

15            MS. PANOUSIERIS:  It's not quite accurate, Your Honor,

16   in the sense that there was a followup that's not at issue

17   before the Court today after plaintiff's deposition describing

18   the incident occurring down the hallway downstairs into the

19   elevator.  So there as a followup request for those cameras as

20   well.  That's still outstanding, and it has not reached its

21   30 days yet, and so there is not just two cameras at issue.  I

22   believe plaintiff even requested more than two.  He requested

23   three or four at his disciplinary hearing.

24            If those cameras don't exist, that is why the second

25   set of interrogatories requested their locations and what areas

1  they would capture, which was not responded to, because this is

2  exactly what I need to know is:  What would that camera have

3  shown, and how many of them were there?  Again, to see if

4  Gutwein looked at any of this or anyone reviewed any of it to

5  see the veracity of Mr. Girard's allegations.

6        MS. ZAFFRANN:  And, Your Honor, it was two locations I

7  said, not two cameras.  It was --

8        MS. PANOUSIERIS:  I apologize.

9        MS. ZAFFRANN:  -- the SHU and the mental health unit.

10 Those were the two places where at the time of this incident

11 there were cameras at Green Haven.

12        THE COURT:  Well --

13        MS. ZAFFRANN:  Not in the housing unit.

14        THE COURT:  Okay.  Well, if there is a policy that

15 says you should notify someone to preserve video, and the

16 incident was never in view of the camera, then it's not going to

17 be relevant at trial, but we will just have to see how this

18 shakes out.  Sounds like the plaintiff thinks the incident was

19 not confined as much as the defendants do.

20        Number 23, training regarding use of force.  I think

21 we need to just limit it as to time.  We can't go back to the

22 year one.  So why don't we say previous five years, and only as

23 to Polito, Rios, Blot, and Elmore.  I'm sure this has been

24 collected for other cases, and it doesn't sound like it would be

25 particularly burdensome.  I'm sure there is a training unit that

1  keeps all of this stuff.

2          Now, what about 24, the litigation holds?  I've got to

3  think that by the time anybody was aware that there was going to

4  be litigation, these videos were all long gone, but correct me

5  if I am wrong.

6          MS. ZAFFRANN:  Yes, Your Honor.  I can provide the

7  privilege log with respect to communications from the attorney

8  general's office regarding litigation hold.

9          THE COURT:  All right.

10         MS. PANOUSIERIS:  Your Honor, I would just ask that

11 that also extends to DOCCS counsel, and it -- I'm happy to

12 receive a privilege log because it will have those dates -- if

13 it's a proper privilege log, it will have the dates of those

14 communications, and I don't need to see their contents in order

15 to establish when the communications were made.

16         THE COURT:  All right.  Now I'm saying June 20th for

17 all of this.  When are the depositions scheduled for?

18         MS. ZAFFRANN:  June 13th, 14th and 15th.

19         THE COURT:  So maybe I should say a little sooner.

20         MS. PANOUSIERIS:  Well, I would love that, Your Honor.

21 Of course, I would prefer to have, at a minimum, the

22 disciplinary records and the policies because those are going to

23 be directly relevant to my questions.  They are the most

24 important to me for the depositions, but I'm happy to have

25 everything sooner rather than later, understanding that DOCCS

1  takes a little time to get things turned over.

2          THE COURT:  Well, the disciplinary records and the

3  policies, why don't we say June 10th, and the rest June 20th,

4  and you can spend the weekend studying them.

5          MS. PANOUSIERIS:  Yes, Your Honor.  I will.

6          THE COURT:  All right.  And let me refresh my memory

7  on what our schedule is.  We have a conference July 11th.  All

8  right.

9          Anything else we should do this morning?

10          MS. PANOUSIERIS:  Yes, Your Honor.  I would just ask

11  the Court to also make a ruling on the state of the

12  interrogatories of both sets.  That was mentioned at the end of

13  my letter.  It's the plaintiff's position that they just are not

14  adequately responded to at all, and I would like full responses

15  that to each of the interrogatories in set one and set two, and

16  the reason I didn't break them down is because I think it's

17  plain on their face that they are insufficient.  If you just

18  take a look at the responses, they refer me to other documents.

19  They are not actually full written responses, which is what are

20  required.  For example, the first interrogatory on set two asks

21  for the descriptions of the locations of the cameras at issue

22  and what areas they capture, and the response was just that I

23  would get a policy when we get a protective order, and it's not

24  clear to me how the policy itself would respond to that

25  interrogatory in full.  And it's my position that even if it

1  did, the State must actually respond to the interrogatory as to

2  the individuals defendants, rather.

3          MS. ZAFFRANN:  Your Honor, I looked at the deficiency

4  letter, and we had actually gone over many of the inter-

5  rogatories, and it's a little surprising because when the second

6  set of interrogatories, when we discussed it, we agreed that

7  there would be a confidentiality agreement, which I have

8  provided, but counsel has not signed and has not responded to

9  me.  She's provided a response.  I called her and emailed her to

10 discuss it further, but I didn't get a response yet.  And my

11 understanding was that we didn't have a problem with the second

12 set of interrogatories.  Once the directive and policy was

13 produced, that that may respond to many of the inquiries, and I

14 did respond that there are two locations where the cameras were

15 at the facility on the day of the incident:  The special housing

16 unit and the mental hygiene unit, and that the mental hygiene

17 unit was not a recording surveillance, but it was just for

18 observation of incarcerated persons that are in the mental

19 hygiene unit.

20         THE COURT:  So what more do you need?

21         MS. PANOUSIERIS:  Well, Your Honor, again, there is a

22 followup that's outstanding that's about -- to kind of expand on

23 those cameras, and I am trying to understand what those cameras

24 would have actually captured.  Is it cells?  Is it the walkway?

25 Where were they pointed, and where are they located within the

1  unit?  So while I appreciate acknowledgment of their existence,

2  it's not quite what the interrogatory was getting at.

3       And as to our prior conversation, I did represent to

4  Ms. Zaffrann that I was happy to look at the policies to see

5  what it resolved, but it's still my contention that both sets of

6  interrogatories are incredibly deficient in that they don't

7  actually respond.  And I am more than happy to discuss the

8  protective order.  I was out of the office the day that

9  Ms. Zaffrann called me.  I've got it with me today.  We have a

10 small dispute on some of the contents of it.

11      THE COURT:  We'll talk about it right as soon as we

12 are done.

13      MS. PANOUSIERIS:  Exactly.  I am happy to talk about

14 it today when we're finished.

15      THE COURT:  So I am looking at the answer to request

16 nine.  It says the cameras depicted the general areas within

17 those specialized units.  I think they can probably be a little

18 more specific than that.  You know, are we talking about:  Do

19 they show the bubble?  Do they show individual cells?  Do they

20 show -- I don't know what the SHU has besides individual cells,

21 if anything.  And the mental health unit, it doesn't -- I don't

22 think you need to provide that detail because there is no

23 recording, but for the SHU, just give a little more detail.

24 The --

25      MS. ZAFFRANN:  Your Honor, if I may, I can certainly

1  do that.  I, myself haven't seen the directive that was being

2  requested here because DOCCS hasn't provided it to me without a

3  confidentiality agreement.  So once I receive it, it may answer

4  some of these questions, which is what I had told plaintiff's

5  counsel.

6          THE COURT:  Okay.

7          MS. ZAFFRANN:  And so we will hope that it turns out

8  to be a big nothing.

9          MS. PANOUSIERIS:  And I am happy to do that with the

10  second set, Your Honor.  I would like to go over the first set

11  as well.  It's my understanding from our prior meet-and-confers

12  is that the defendants did not intend to elaborate more than

13  they have in their amended responses, which I believe was

14  Exhibit F to my letter.  And if Your Honor could just take a

15  quick look at those, you will see I did appreciate that when

16  Ms. Zaffran reproduced them, she expanded on some of her

17  objections.

18          THE COURT:  I just want to --

19          MS. PANOUSIERIS:  Yes, no problem.

20          THE COURT:  I don't have exhibits numbers.  I have ECF

21  number --

22          MS. PANOUSIERIS:  It's 94-6.

23          THE COURT:  94-6 is the --

24          MS. PANOUSIERIS:  Is the amended responses to the

25  document requests -- first set of document requests and

 1  interrogatories.   The interrogatories begin on page 7 of 94-6.

 2           THE COURT:  I only have three pages of 94-6.  Hold on.

 3  I need to -- for some reason -- oh, wait.  I do have it.  94-6,

 4  page 7.  Okay.  So and where were the corresponding requests?

 5           MS. PANOUSIERIS:  I'm sorry?

 6           THE COURT:  Where are the corresponding requests?

 7           MS. PANOUSIERIS:  They begin on -- they are at 94-1,

 8  beginning on page 12.

 9           THE COURT:  Okay.  And are you complaining about all

10  of them?

11           MS. PANOUSIERIS:  Well, Your Honor, not the identify

12  the name, not the first few that are just asking for

13  descriptions of -- or identify names.  I take counsel's word

14  that her initial disclosures were comprehensive other than one

15  followup email, which is not before the Court today.  I asked

16  for one additional person's identity.  Let me just -- I lost my

17  page.  One second.

18           MS. ZAFFRANN:  Your Honor, if I may, I'm -- this is

19  kind of confusing to me because we did a meet-and-confer

20  telephonically on the first interrogatories in March.  I amended

21  consistent with what I believed were our agreements, and the

22  only request was to provide more specificity within the

23  documents as to where the responses were located, which I did by

24  March 31st.  I don't see anything in the letter.  Can you tell

25  me, direct me to your letter where you are talking about the

1  deficiencies?

2       MS. PANOUSIERIS:  I just mentioned in the final

3  paragraph of my letter, and as I stated before, I did not

4  enumerate these because I think that they are deficient on their

5  face, which was conveyed during our last two conversations and

6  in various emails.

7       And so it's my understanding that an interrogatory --

8  that the federal rules require that an interrogatory be

9  responded to in full, not just a reference to a document.  That

10 would be what the document request is for, and I do appreciate

11 Ms. Zaffrann's updated document request, which point me to the

12 proper documents.  But for interrogatories, it's a bit

13 different, and there is a bit more of a responsibility to answer

14 in full, not just point me to documents.

15      So that's what I am looking for.  I'm looking for

16 actually sufficient responses under the federal rules.

17      MS. ZAFFRANN:  And, Your Honor, again, this was

18 provided at the end of March.  There was no additional

19 discussions about the alleged deficiencies in the amended

20 responses.  My understanding is that if the information is

21 contained in the document, and I highlight where that

22 information is, that is sufficient.

23      THE COURT:  Yeah.  I mean, look, like I'm looking at

24 number four:  Identify every instance where any of the

25 defendants have been disciplined.  Okay.  That's too broad, and

1   you are going to get their disciplinary files.  So I don't think

2   they have to write out a list of the things that are going to be

3   in their disciplinary files.  That's just busywork.

4          Number five, every civil case where they've testified.

5   Again, I think it's overbroad, but you're going to get

6   information about every case where they've been sued, and you

7   can take it from there.  Same with six.

8          So, you know -- let's see, number seven.  Anybody you

9   think may have been a witness.  Eight -- I mean, look, if there

10  is actually something substantive that you think you are missing

11  because they didn't write out the answer, that's one thing;

12  but -- which is why I've directed more detail regarding

13  interrogatory number nine.  But, you know, if you are going to

14  get their disciplinary file, I don't think they have to

15  summarize it for you in an interrogatory.

16         MS. PANOUSIERIS:  And I'm fine with that, Your Honor.

17         THE COURT:  It's not a good use of anybody's time,

18  and --

19         MS. PANOUSIERIS:  I guess it was unclear to me if all

20  of this information that I am seeking would be contained within

21  the disciplinary file, but if it is, and it resolves what I am

22  looking for, I'm happy to just use those records.

23         THE COURT:  Obviously, to the extent your reference to

24  a document doesn't fully answer the question, you would have to

25  add more; but to the extent it does, you don't.

1          All right.  I was glad to see, by the way,

2  Ms. Zaffrann, that the federal bar counsel -- we can go off the

3  record.

4          (Discussion off the record)

5          THE COURT:  All right.  Back on the record.

6          I'm certainly going to ask you at the next conference

7  about settlement, and maybe I'm imagining it, but I have found

8  DOCCS of late more amenable to settlement, but usually only

9  in -- well, I shouldn't say usually only in *pro se* cases because

10 I think it's rare that I have one of these cases that's not *pro*

11 *se*, but they have been coming up with, you know, a few thousand

12 bucks for *pro se* plaintiffs.  Once attorney's fees come into the

13 picture, it's a little harder.  But I will certainly ask you,

14 and if we are going to have motions, we will have motions.

15         Anything else we should do this morning?

16         MS. ZAFFRANN:  No.  That's it, Your Honor.  Thank you.

17         MS. PANOUSIERIS:  That's it, Your Honor.  Thank you.

18         THE COURT:  All right.  Walter, can they have the room

19 if they want to work on a protective order?

20         THE DEPUTY CLERK:  Sure.

21         THE COURT:  Okay.

22         MS. ZAFFRANN:  I'm sorry.  One last thing.  I

23 anticipate that we are going to be filing an attorney-eyes-only

24 confidentiality agreement with respect to the policies or

25 directives about the video cameras.

.

1          THE COURT:  That's all right with you, right,

2  Ms. Panousieris?

3          MS. PANOUSIERIS:  Yes.  And if it becomes an issue, we

4  will approach the Court, but I have no problem with them being

5  produced under a designation.

6          THE COURT:  Okay.  Good.  All right.  Have a good

7  weekend, everyone.

8                              -oOo-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25